# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

OPTIO RX, LLC &
CRESTVIEW PHARMACY, LLC,

        Plaintiffs,

    v.

CRESTVIEW CITY PHARMACY,
INC., JENNIFER RESHAY
DENSMAN, CHRISTOPHER NEIL
DENSMAN & BRYAN HENDERSON,

        Defendants,

AMANDA DAVEY, CLAUDIA
BARNETT, KARI WAITES,
VICTORIA BALLARD,
MORGAN MEEKS, KYNDALL
BARBER & ELLEN STAFFORD

        Nominal Defendants.

Case No. 3:23-cv-08993-MCR-HTC

## PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF THEIR EMERGENCY VERIFIED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to the Court's Order entered on May 5, 2023 [Dkt. 28], Plaintiffs, OPTIO RX, LLC and CRESTVIEW PHARMACY, LLC (collectively, "Plaintiffs" or the "Company"), by and through their undersigned counsel, submit this post-hearing brief to address the issues raised during the May 5, 2023 evidentiary hearing on Plaintiffs' Emergency Verified Motion for Temporary Restraining Order and Preliminary Injunction (the "Emergency Motion").

## I.    <u>INTRODUCTION</u>

Before the Court is Plaintiffs' Emergency Motion, seeking emergency injunctive relief precluding Defendants Crestview City Pharmacy, Inc., Jennifer Reshay Densman, and Christopher Neil Densman (collectively, "Defendants") from engaging in further unfair competition with Plaintiffs. The factual allegations detailed in the Verified Complaint and Emergency Motion, and substantiated with witness testimony and documentary evidence presented during the May 5, 2023 evidentiary hearing (the "Evidentiary Hearing"), demonstrate that a preliminary injunction is essential and appropriate in this matter. Each of the elements supporting preliminary injunctive relief have been established.

In fact, Defendants indirectly acknowledged the presence of the applicable standard for preliminary injunctive relief, including Plaintiffs' likelihood of success on the merits, by already stipulating to certain injunctive relief to address some of the concerns which necessitated the filing of the Verified Complaint and Emergency Motion. For instance, as stipulated during the Evidentiary Hearing, Defendants have agreed to: (1) cease doing business under the unfairly competitive tradename, Crestview City Pharmacy, (2) affirmatively file updated articles of incorporation, changing the name of Crestview City Pharmacy to Hometown Pharmacy, Inc., and (3) return to Crestview Pharmacy all emails and other documents in Defendants'

possession, custody or control. (Evidentiary Hearing Transcript ("Tr."), at 6-9, [Dkt. 29].)

Similarly, co-Defendant Bryan Henderson has stipulated to: (1) comply going forward with the terms of his Employment Agreement dated December 13, 2018; (2) return to Plaintiffs certain vials of testosterone that were wrongfully taken from Crestview Pharmacy by Mr. Henderson on April 20, 2023; (3) turn over any passwords for any accounts used in furtherance of Mr. Henderson's work for Crestview Pharmacy; and (4) return to Crestview Pharmacy any Company files or other documents in his possession, custody or control. (Tr. 17-18.)

Given the foregoing stipulations, the issues presently before the Court on Plaintiffs' Emergency Motion have been greatly narrowed. The emergency injunctive relief that Plaintiffs further seek is limited to Plaintiffs' request for a preliminary injunction precluding Defendants from: (1) soliciting or doing business with the medical providers identified on Plaintiffs' confidential and proprietary Top Providers list that Mrs. Densman improperly forwarded to her personal email on April 14, 2023, and (2) employing or otherwise engaging any of the former Crestview Pharmacy employees that Defendants improperly solicited, while employed by Crestview Pharmacy.

Such relief is necessary to prevent further irreparable harm to Plaintiffs caused by Defendants' broad unfair competitive activity, which has included: (1) coercing

Crestview Pharmacy employees to not enter into a Non-Disclosure Agreement with Crestview Pharmacy, (2) soliciting those same employees to leave their employment with Crestview Pharmacy to accept competing employment at Crestview City Pharmacy, (3) misappropriating Plaintiffs' trade secret information, including but not limited to, a list of Crestview Pharmacy's "Top Providers," many of whom Defendants conveniently are now servicing to Plaintiffs' detriment, and (4) orchestrating an intentional slowdown of work at Crestview Pharmacy immediately prior to their planned resignation in order to sabotage Crestview Pharmacy's operations and its relationships with its existing providers.

Defendants' wrongful conduct has irreparably damaged, and will continue to irreparably damage, Plaintiffs' business, reputation, and goodwill, absent Court intervention. As such, emergency injunctive relief is necessary and justified to prevent, or at least limit, further irreparable harm.

## II.   STATEMENT OF FACTS

In support of the Emergency Motion, Plaintiffs hereby incorporate by reference the verified allegations set forth in Plaintiffs' Verified Complaint for Injunctive and Other Relief [Dkt. 1] and the Emergency Motion [Dkt. 1-6], which were properly submitted to the Court in advance of, and to which Defendants did not object during, the Evidentiary Hearing. Accordingly, such allegations should be given due consideration for purposes of the present Emergency Motion.

In support of, and addition to, the facts averred in the Verified Complaint and Emergency Motion, the following facts were demonstrated during the Evidentiary Hearing:

### A.   Crestview Pharmacy

Plaintiff Crestview Pharmacy was founded in 2001 by Defendant Bryan Henderson, along with Hal Densman and Mitchell Spreier. (Tr. 33, 35, 68.) Crestview Pharmacy historically has offered specialty compounded medication services, as well as retail pharmacy services, to medical providers and their patients in and around Crestview, Florida, and in more than 30 other states across the United States. (Tr. 33, 35, 117, 130). In particular, Crestview Pharmacy operates its own compounding laboratory in which medications are compounded to the specific requirements of Crestview Pharmacy's prescribing physicians. (Tr. 33-34.) These compounded medications typically are manufactured and shipped to patients within 48 hours of Crestview Pharmacy's receipt of a prescription. (Tr. 116-117.)[1]

---

[1] On December 6, 2018, OptioRx acquired Crestview City Pharmacy pursuant to a Membership Interest Purchase Agreement. (Tr. 33, 36, 135; Pl. Ex. 11(c).) Pursuant to that sale, OptioRx acquired all of Crestview Pharmacy's assets, including its customer lists. (Tr. 135.) While the other former owners of Crestview Pharmacy exited the business at the time of closing, Defendant Henderson agreed to remain employed at Crestview Pharmacy as a pharmacist. Mr. Henderson then entered into an Employment Agreement with Crestview Pharmacy dated December 13, 2018 (Tr. 37; Pl. Ex. 1). In that Agreement, Mr. Henderson covenanted not to compete with Crestview Pharmacy or to solicit Crestview Pharmacy's customers and employees for a period of five years following the termination of his employment. (*Id.*) Mr. Henderson remains a party to this litigation but is no longer the subject of the instant Emergency Motion given the parties stipulations during the Evidentiary Hearing.

Due to the specialized nature of the compounding services that Crestview Pharmacy offers its providers and patients, Crestview Pharmacy has formed long-term business relationships with its customers and prescribers. (Tr. 33-34, 156.) Indeed, multiple witnesses testified that Crestview Pharmacy employees work closely with prescribing physicians to provide specific recommendations concerning compounded medications, including as to suggested dosage changes. (Tr. 34; 155-56.) Given these close professional business relationships, it is common for providers to routinely send most, if not all, of the prescriptions for their patients to Crestview Pharmacy. (Tr. 34.) Some of these business relationships date back to Crestview Pharmacy's inception. (Tr. 34-35.) Mrs. Densman confirmed as much at the Evidentiary Hearing, testifying that Crestview Pharmacy had done business with its Top Providers "for years" and that during that time these providers had done "constant repeat business" with Crestview Pharmacy. (Tr. 156.)

In furtherance of its business, Crestview Pharmacy has generated substantial confidential and proprietary business information, including, but not limited to, sensitive financial information concerning the business that it does with medical providers and their patients. (Tr. 57-61.) Such information includes "proprietary financial information on the profitability of the [C]ompany," including as to pricing and margins, vendor information, and cost of ingredients, as well as information concerning Crestview Pharmacy's top medical providers. (Tr. 57-58, 61.)

Due to the nature, importance and value to Plaintiffs of this proprietary, confidential trade secret information, Plaintiffs take steps to protect this confidential trade secret information from disclosure. For instance, Plaintiffs restrict access to sensitive information by requiring end users to have dedicated usernames and password to access the Company's electronic systems. (Tr. 36.) Additionally, OptioRx maintains an Employee Handbook, which contains, *inter alia*, policies concerning the Confidentiality of Business Information at all its pharmacies, including Crestview Pharmacy. (Tr. 36, 63; Pl. Ex. 10.) Specifically, the Employee Handbook defines Confidential Information to include, among other things, "trade secrets, research, client data and information or cost or purchases of Client's products or services," and further provides that such information "should not be disclosed to any party without the appropriate consent of … OptioRx." (Tr. 63; Pl. Ex. 10.) In other words, Plaintiffs expect that Crestview Pharmacy personnel— particularly supervisors such as Defendants—to protect the Company's confidential information from disclosure. (Tr. 62-64.) As employees Defendants were subject to these workplace rules and, in fact, Defendants were (or should have been) aware of this expectation as Mrs. Densman testified that she had received and had reviewed portions of the Employee Handbook. (Tr. 154-55.)

### B.   Defendants' Employment at Crestview Pharmacy

Defendants were long-time employees of Crestview Pharmacy. Mrs. Densman began her employment with Crestview Pharmacy in 2013, initially holding the entry-level position of cashier. (Tr. 38, 133, 187.) However, Plaintiffs invested in Mrs. Densman's professional development, promoting her numerous times during her employment, including to the roles of technician, pharmacist, and, ultimately, general manager. (Tr. 187.) Because she did not have prior experience in this field of business, it necessarily follows that Mrs. Densman did not have prior business relationships in relevant business with any of the medical providers that she eventually would come to service on behalf of Crestview Pharmacy. Instead, those relationships were developed and nurtured only through her ten years of employment with Plaintiffs.

Most recently, Mrs. Densman was employed by Plaintiffs as the general manager of Crestview Pharmacy. (Tr. 38, 134.) As Crestview Pharmacy's general manager, Mrs. Densman was tasked with managing staff and overseeing operations, including ensuring that medications were timely dispensed to patients within the expected 48-hour window. (Tr. 39, 129-130, 134-35.) Mrs. Densman further was responsible for overseeing the financial performance of Crestview Pharmacy, including managing inventory, pricing, and tracking gross margins. (Tr. 129.)

Defendant Neil Densman is married to Mrs. Densman. (Tr. 43.) Prior to this litigation, Mr. Densman worked at Crestview Pharmacy for 13 years. (Tr. 43, 244.) Most recently, Mr. Densman was employed as the Lead Compounding Technician in the compounding laboratory at Crestview Pharmacy. (Tr. 43-44.) In this role, Mr. Densman was responsible for overseeing the compounding process at Crestview Pharmacy. (Tr. 44.) He further was responsible for training staff on compounding procedures and ensuring that products met quality requirements. (Tr. 44.) Mr. Densman testified that he was responsible for overseeing the compounding laboratory. (Tr. 238.)

Mrs. Densman notified Crestview Pharmacy of her intention to resign from her employment on February 14, 2023. (Pl. Ex. 6.) However, she later extended her resignation date to April 21, 2023. (Tr. 99, 237.) At some point, Mr. Densman also notified Plaintiffs of his intention to resign at the same time as Mrs. Densman. (Tr. 236-37.) As explained in detail below, the record evidence confirms that Defendants used the last several months of their employment with Crestview Pharmacy to unfairly compete on behalf of their newly formed pharmacy, Crestview City Pharmacy, Inc.

C.   **Defendants' Creation of a Competing Pharmacy and Competitive Actions in Furtherance Thereof**

On October 17, 2022, Defendants incorporated their competing business, Crestview City Pharmacy, Inc. (Tr. 53-54, 135; Pl. Ex. 7.) Specifically, Mrs.

Densman filed Articles of Incorporation registering Crestview City Pharmacy to do business in the State of Florida. (*Id.*) Notably, Mrs. Densman did not notify Plaintiffs of her intentions to open a competing pharmacy, nor of her plan to operate under the tradename Crestview City Pharmacy. (Tr. 137.)

After forming Crestview City Pharmacy, Defendants immediately began unfairly competing with Plaintiffs despite their active, ongoing employment status. Indeed, testimony from numerous witnesses, including Defendants themselves, confirms numerous instances of clear competitive conduct by Defendants, during the course of their employment, including but not limited to:

### 1. Interference with Plaintiffs' Rollout of the Non-Disclosure Agreement

In late October 2022, OptioRx rolled out to employees nationwide its Non-Solicitation, Non-Disclosure and Invention Assignment Agreement (the "Non-Disclosure Agreement") (Tr. 40-41; Pl. Ex. 2). The Non-Disclosure Agreement contained post-employment restrictive covenants that preclude employees from soliciting Plaintiffs' employees (Section 7(a)) and customers (Section 7(b)) for a period of one year following the termination of their employment. (Pl. Ex. 2.) The Non-Disclosure Agreement further prohibited employees from disclosing Plaintiffs' Confidential Information for unauthorized purposes (Section 2(b)). (*Id.*)

Rather than support (or at a minimum remain neutral to) Plaintiffs' efforts to enter into direct Non-Disclosure Agreements with their own employees, Mrs.

Densman urged her subordinate Crestview Pharmacy employees to refrain from signing the Non-Disclosure Agreement (Tr. 163, 208.) In particular, Laboratory Technician April Koski testified that Mrs. Densman repeatedly informed employees, over a period of several months, that if they signed the Non-Disclosure Agreement that they "would not be able to work in pharmacy ever again." (Tr. 209.) Mrs. Densman further admitted to providing employees with a document from her attorney detailing purported "findings" concerning the Non-Disclosure Agreement. (Tr. 163.) In other words, Mrs. Densman actively took steps to prevent other employees from entering into a Non-Disclosure Agreement with OptioRx.

As result of Mrs. Densman's actions, most of the employees at Crestview Pharmacy refused to sign the Non-Disclosure Agreement (Tr. 41-43, 210.) Instead, numerous employees submitted letters to OptioRx stating their intention to wait for legal advice from Mrs. Densman's attorney before signing the Non-Disclosure Agreement. (Pl. Ex. 4.) Ms. Koski testified that these letters were prepared at the direction and urging of Mrs. Densman. (Tr. 210-211.)

The timing of Mrs. Densman's efforts to prevent Crestview Pharmacy employees from signing the Non-Disclosure Agreement directly coincides with Mrs. Densman's formation of her competing business, Crestview City Pharmacy. Indeed, Mrs. Densman filed Articles of Incorporation for Crestview City Pharmacy (Pl. Ex. 7), just over one week prior to Plaintiffs' rollout of the Non-Disclosure Agreement

on October 28, 2022. (Tr. 40, 54-55, 127.) Thus, at the same time that Mrs. Densman was discouraging employees from signing the Non-Disclosure Agreement, Defendants actively planned to start a nearby competing pharmacy and solicit away Plaintiffs' employees, prescribers and customers.

      **2.**     **Defendants' Recruitment of Emily Blackmon while Employed by Plaintiffs**

Not only did Mrs. Densman discourage employees from signing the Non-Disclosure Agreement, but just months after Mrs. Densman formed Crestview City Pharmacy, she also recruited Pharmacist Emily Blackmon to leave her employment at Crestview Pharmacy to join Defendants at Crestview City Pharmacy.

Specifically, Mrs. Densman testified that she sought Ms. Blackmon's assistance with completing Crestview City Pharmacy's Florida pharmacy license application. (Tr. 140.) Mrs. Densman admitted that because she (Mrs. Densman) was registered with the State of Florida (given her active employment status) as the general manager for Crestview Pharmacy, she could not also be listed as the general manager on the application to obtain a pharmacy license for Crestview City Pharmacy. (Tr. 52-53, 140-41.) In order to obscure her competitive activity, Mrs. Densman instead arranged to list Ms. Blackmon as the general manager on the application. (Tr. 52-53, 141.) That application was submitted to the State of Florida in or around January 2023, and a pharmacy license was issued to Crestview City Pharmacy on February 10, 2023. (Tr. 51, 140; Pl. Ex. 8.) As of April 7, 2023, Ms.

Blackmon was listed on the Florida Department of Health website as the "RX DPT MGR/COR/POR" (i.e., the general manager) of Crestview City Pharmacy, whereas Mrs. Densman was listed as a "Pharmacy Affiliate." (Tr. 52; Pl. Ex. 8.)  Ms. Blackmon remained actively employed by Plaintiffs throughout these wrongful actions.  (Tr. 52.)

Despite her filing of an application with the State of Florida Department of Health reflecting that Emily Blackmon had been engaged as Crestview City Pharmacy's general manager since at least February 10, 2023, Mrs. Densman now miraculously maintains that she did not at the time offer Ms. Blackmon a job at Crestview City Pharmacy. (Tr. 141, 175.) Mrs. Densman's testimony in this regard should be seen for what it is—a desperate attempt to escape responsibility for her plain efforts to solicit Plaintiffs' employees while still employed at Crestview Pharmacy.

### 3. Defendants' Improper Solicitation of Other Employees While Employed at Crestview Pharmacy

Defendants did not stop after wrongfully soliciting Ms. Blackmon to join them at Crestview City Pharmacy. Rather, it is indisputable that over the next several months, while actively employed by Crestview Pharmacy, Defendants improperly solicited a number of Crestview Pharmacy employees to join them at Crestview City Pharmacy.

It was widely known amongst employees at Crestview Pharmacy that Defendants intended to open a competing pharmacy. (Tr. 127-128; 197, 207, 241.) Mrs. Densman testified that she told everyone employed at Crestview Pharmacy of her plans to open a competing pharmacy. (Tr. 197-98.) It further was widely known that Defendants intended to hire away to Crestview City Pharmacy most, if not all, of the employees of Crestview Pharmacy. (Tr. 198.) Indeed, Mrs. Densman testified that she led employees to believe that they would have a place at her new pharmacy. (Tr. 198.) When asked by the Court whether she had informed employees that "You're going to have a job when this pharmacy opens," Mrs. Densman responded, "I may have said that, yes, ma'am." (Tr. 180.) These statements regarding Defendants' plans to open a new pharmacy and hire Crestview Pharmacy employees were made while the Defendants and the employees in question were employed by, and actively on the clock at, Crestview Pharmacy. (Tr. 198.)

In addition to the foregoing, Pharmacy Technician April Koski testified that she learned of Defendants' plans to open a competing pharmacy in early 2023 directly from Mr. Densman. (Tr. 207.) Ms. Koski specifically recalled Mr. Densman stating, "we are going to start a new pharmacy," and implying that all Crestview Pharmacy employees would join Defendants at this new pharmacy. (Tr. 208.) She further testified that Mr. Densman regularly discussed the new pharmacy with employees in the compounding lab, disclosing (1) that the new pharmacy was about

five minutes away, (2) that the new pharmacy would be called Crestview City Pharmacy, (3) that the pharmacy had all of the machines needed to operate, (4) that Defendants were awaiting final DEA inspection prior to opening the new pharmacy, and (5) that once the new pharmacy opened, employees would join Defendants at Crestview City Pharmacy while Bryan Henderson would remain at Crestview Pharmacy in order to "to transfer all of the prescriptions over to the new pharmacy." (Tr. 211.)

Despite the Defendants' openness regarding their competing pharmacy to other Crestview Pharmacy employees, it is clear that Defendants sought to obscure their plans from Plaintiffs. Indeed, in the days leading up to the Nominal Defendants' resignation *en masse*, OptioRx's Chief Pharmacy Officer, Andrew Charter, met with employees and asked whether they intended to remain at Crestview Pharmacy or join Defendants at their competing pharmacy. (Tr. 101-103.) The response that Mr. Charter received from employees was a unanimous, "I don't know what I want to do," implying that employees were aware of, and had been asked to join Defendants at, Crestview City Pharmacy. (Tr. 102-103, 128.) However, we now know Defendants had "successfully" solicited the employees to join Defendants at their competing pharmacy.

Indeed, the majority of Crestview Pharmacy's employees have resigned and joined Defendants at Crestview City Pharmacy. This mass defection began

immediately after Plaintiffs notified Defendants that their employment had been terminated on the morning of April 20, 2023. (Tr. 69-72.) Within minutes of learning that Defendants were no longer employed at Crestview Pharmacy, the majority of the other employees either walked off the job, without warning, or provided two-weeks' notice of their intention to resign. (Tr. 69-72.) Specifically, Pharmacists Brittany McDaniel and Emily Blackmon gave two weeks' notice of their intention to resign on April 20, 2023, respectively resigning effective May 4 and May 5, 2023. (Tr. 70-73; Pl. Ex. 12(a).) The remaining employees, Nominal Defendants Amanda Davey, Claudia Barnett, Kari Waites, Victoria Ballard, Morgan Meeks, Kyndall Barber, and Ellen Stafford (the "Nominal Defendants"), simply walked off the job without warning. (Tr. 70-72.) As a result of this mass resignation, Crestview Pharmacy was left with just a single active remaining employee (i.e., April Koski). (Tr. 72.)

Underscoring that the Nominal Defendants' actions were part of a coordinated resignation *en masse*, four of the Nominal Defendants (i.e., Ms. Barber, Ms. Meeks, Ms. Ballard, and Ms. Waites) later submitted to Plaintiffs identical resignation letters stating, in part, "Please accept this letter of formal resignation from my position at Crestview Pharmacy. My last day of employment will be today, 4/22/23." (Tr. 72-73; Pl. Ex. 12.) Mrs. Densman further testified to reviewing the resignation letter template before it was submitted to Plaintiffs. (Tr. 172-173.)

16

The evidence further confirms that Crestview City Pharmacy now employs most of the Nominal Defendants. While Mrs. Densman sought to downplay the existence of an employment relationship with the Nominal Defendants, she conceded Defendants extended offers of employment to Ms. Waites, Ms. Ballard, Ms. Meeks, Ms. Barber, Ms. Stafford, and Ms. Blackmon. (Tr. 164-67.) She further conceded that Ms. Waites, Ms. Barber, Ms. Meeks and Mrs. Ballard were present at Crestview City Pharmacy (and thus presumably working) alongside Defendants on May 3, 2023. (Tr. 76-78, 166-168; Pl. Ex. 13.) Accordingly, the evidence establishes that, at a minimum, Ms. Waites, Ms. Barber, Ms. Meeks and Mrs. Ballard are now employed by and/or working on behalf of Crestview City Pharmacy.

### 4.    Defendants' Misappropriation of Plaintiffs' Trade Secrets

In addition to the foregoing, the testimony offered at the Evidentiary Hearing confirms the averments in the Verified Complaint and Emergency Motion—namely, that Defendants misappropriated a number of emails containing Plaintiffs' trade secret information. Specifically, Mrs. Densman admits to forwarding at least 20 emails from her work email account to her personal email in the weeks after she announced her intention to resign from her employment with OptioRx. (Tr. 59, 155, 191-193; Pl. Exs. 9(a)-(c), 14.) The vast majority of these emails contained financial information relating to Crestview Pharmacy's business, including financial statements for 2021 and 2022, as well as a now "deleted" email forwarding a list of

Crestview Pharmacy's "Top Providers" and related financial information detailing the profitability of the services provided to such providers. (Tr. 55-62.) These documents were knowingly forwarded by Mrs. Densman. (Tr. 195.)

As but one example of the many forwarded documents, Mrs. Densman admits to forwarding to her personal email address an email titled "Top Providers," at 12:41 AM on April 14, 2023, just one week prior to Mrs. Densman's then scheduled resignation date. (Tr. 59, 145.) The Top Providers email contained a list of the top 20 medical providers working with Crestview Pharmacy, as well as financial information relating to those provider accounts. (Tr. 55-58; Pl. Ex. 9(a).) These providers account for 60-70% of the prescriptions filled at Crestview Pharmacy. (Tr. 56.)

The documents forwarded by Mrs. Densman contain Plaintiffs' confidential trade secret information, detailing Crestview Pharmacy's proprietary financial information, including the pricing of medications sold to customers, the pricing of materials and/or medications purchased by Crestview Pharmacy, and the resulting profitability revenue generated from such accounts. (Tr. 61.) Moreover, this information is not known by Crestview Pharmacy's competitors or the public at large. (Tr. 61-62.) Instead, the foregoing information is considered confidential, and is subject to restricted employee access. (*Id.*)

**5.    Defendants' Intentional Slowdown of Production and Disregard for Laboratory Conditions**

Witness testimony also confirms that in the days leading up to Defendants' planned resignation, Defendants allowed conditions at Crestview Pharmacy to deteriorate, resulting in a dramatic slowdown in production. (Tr. 85, 118-119, 212-13.) Indeed, Mr. Charter testified that conditions were such that the compounding laboratory was covered in powder, a press machine was left unrepaired and unused for want of a single bolt, and inventory for compounding materials and prescription labels were severely depleted. (Tr. 85, 118-19.)

While Defendants were responsible for pharmacy operations at Crestview Pharmacy, Mr. Densman conceded that he had no incentive to address the cleanliness of the compounding room or the broken press machine (which again was later easily fixed by replacing a single bolt). (Tr. 85-86, 237-239.)  As a result of Defendants' actions, Crestview Pharmacy was well behind its normal 48-hour production goal on April 20, 2023. (Tr. 223-24.) Indeed, Ms. Koski testified that Crestview Pharmacy was 48-72 hours behind on filling prescriptions—further behind than at any other time during her five years of employment. (Tr. 224, 226.) That production delay only exacerbated following the Nominal Defendants' planned mass resignation on April 20, 2023. (Tr. 226.)

**D.**   **Defendants' Unfair Competitive Conduct Has Caused and Will Continue to Cause Irreparable Harm to Plaintiffs**

Not only has the evidence proven that Defendants engaged in unfair competitive conduct, while employed by Plaintiffs, but the testimony offered during the Evidentiary Hearing underscores that Defendants' conduct has caused, and will continue to cause, irreparable harm to Plaintiffs absent injunctive relief.

Specifically, Mr. Charter testified that following Defendants' employment termination and the corresponding mass resignations by the Nominal Defendants, Crestview Pharmacy was at a standstill, as "[t]here was no one there to manufacture compounds." (Tr. 73.) Mr. Charter further testified that while Plaintiffs hired and trained new staff, as well as temporarily relocated some employees from other pharmacies, the efforts to rebuild Crestview Pharmacy took time. (Tr. 83.) As a result, Crestview Pharmacy is still not operating at the desired level. (Tr. 74, 82-83.)

The resulting delays in production caused by Defendants' actions ultimately contributed to the decision of at least eighteen (18) physicians, as identified in the record, to cease filling prescriptions through Crestview Pharmacy.   (Tr. 227.) Importantly, six (6) of those physicians were on Plaintiffs' confidential Top Providers lists that Defendants admittedly misappropriated; these prescribers

represent greater than 50% of Crestview Pharmacy's business.[2] (Tr. 227-28; Pl. Ex. 9(a).)

The evidence further establishes that the decision by those Top Providers to transfer away their business from Plaintiffs was hastened by Defendants' "contact[ing] some" of the prescribers on the Top Providers list. (Tr. 155.) Indeed, Mrs. Densman testified that she is currently providing services to nearly half of the physicians on the Top Providers list. (Tr. 147-50, 156, 158, 161-162, 201-02.)

Accordingly, while Plaintiffs have sought to retain as much business as possible from its existing medical providers (Tr. 125-26, 130), the transfer of business away from Crestview Pharmacy as a result of Defendants' unfair competition is ongoing. (Tr. 179, 228-29.) Thus, despite Plaintiffs' best efforts, absent the Court's intervention, Plaintiffs likely will continue to lose business from its longstanding medical providers and their patients due to Defendants' unlawful competitive activity. Once those customers are lost, it is unlikely that Plaintiffs will be able to recover that business. (Tr. 80-81.)

## III.   ARGUMENT

As explained in the Emergency Motion, and substantiated at the Evidentiary Hearing, Plaintiffs are entitled to the requested injunctive relief as they have

---

[2] The specific names of Plaintiffs' Top Providers were discussed on the record, under seal, during the Evidentiary Hearing.

demonstrated: (1) a substantial likelihood of success on the merits; (2) irreparable harm; (3) that the threatened harm to the Plaintiff outweighs the potential damage to defendants; and (4) that, if issued, the injunction would not be adverse to the public interest. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *see also Gale Force Roofing & Restoration, LLC v. Brown*, 548 F. Supp. 3d 1143, 1158 (N.D. Fla. 2021). As discussed below, each element has been more than sufficiently established.

### A.    Plaintiffs Have Established a Likelihood of Success

Importantly, at this juncture, Plaintiffs need show "only *likely* or probable, rather than *certain*, success." *Int'l Hair & Beauty Systems, LLC v. Simply Organic, Inc.,* No. 8:11-cv-1883, 20AEP, 2011 U.S. Dist. LEXIS 127336, at *21 (M.D. Fla. Sep. 26, 2011). Based on the factual allegations set forth in the Verified Complaint, and the witness testimony elicited during the Evidentiary Hearing (as described above), Plaintiffs easily make this showing.

In the Emergency Motion, Plaintiffs sought injunctive relief as to each of the nine counts asserted in the Verified Complaint. However, given the parties' stipulations as to certain of the offending conduct detailed in the Verified Complaint, Plaintiffs presently require injunctive relief only as to their Defend Trade Secret Act ("DTSA"), Florida Uniform Trade Secret Act ("FUTSA"), and common law duty of loyalty and civil conspiracy claims. For the reasons stated in the Emergency Motion

and as further explained below, Plaintiffs have demonstrated the requisite likelihood of success as to each of these claims.

### 1.   Plaintiffs Have Demonstrated a Likelihood of Success on their Trade Secret Misappropriation Claims

To succeed on their trade secret misappropriation claim under the DTSA, Plaintiffs must demonstrate that they: "(i) 'possessed information of independent economic value' that (a) 'was lawfully owned by' the plaintiff[s] and (b) for which the plaintiff[s] 'took reasonable measures to keep secret,' and (ii) the defendant[s] 'used and/or disclosed that information,' despite (iii) 'a duty to maintain its secrecy.'" *See Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1293 (M.D. Fla. 2018). Similarly, with respect to their FUTSA claim, Plaintiffs must show that "(1) they possessed a trade secret and (2) the secret was misappropriated." *See Hurry Family Revocable Tr. v. Frankel*, 8:18-CV-2869-T-33CPT, 2019 WL 6311115, at \*13 (M.D. Fla. Nov. 25, 2019).

In addition to the factual allegations set forth in the Verified Complaint, witness testimony obtained during the Evidentiary Hearing demonstrates that each of the foregoing elements has been satisfied. Specifically, Mr. Charter testified that, in furtherance of their business, Plaintiffs have developed trade secret information consisting of top client lists, financial information relating to those clients, and information concerning the overall financial performance of the business, including information as to profitability, costs, and margins, which is not publicly available.

23

(Tr. 55-61); *see SMS Audio, LLC v. Belson*, No. 9:16-CV-81308, 2016 WL 8739764, at *3 (S.D. Fla. Aug. 16, 2016) (explaining that "[c]ustomer lists can constitute trade secrets"); *see also Marlite, Inc. v. Eckenrod*, No. 09-22607-Civ, 2011 WL 39130, at *5 (S.D. Fla. Jan. 5, 2011) (holding that customer lists and pricing information held to be trade secrets under FUTSA).

Indeed, Mr. Charter testified that Plaintiffs consider the foregoing information to be highly confidential and have taken steps to ensure that their customer lists and business financial information does not become generally known by the public. (Tr. 61.) Such protective measures have included providing access to information to select persons, through password protection and limiting access to the Company's computer systems to those employees with a need to access such information. (Tr. 40-41, 62; Pl. Ex. 2.) Plaintiffs further have implemented an Employee Handbook containing a Confidentiality of Business Information policy, which makes clear that the "general business affairs of our customers and clients should not be discussed with anyone outside of the organization." (Pl. Ex. 10.) The Defendants received and were aware of Plaintiffs' Employee Handbook policies. (Tr. 93, 154-55.)

In addition to these protective measures, Plaintiffs are entitled to rely upon the legal obligation of loyalty to one's employer, irrespective of the foregoing handbook obligations. As this Court previously noted, "an employee's common law duty of loyalty to an employer prohibits disloyal acts in anticipation of future competition,

24

such as 'using confidential information acquired during the course of …
employment.' *See Crom, LLC v. Preload, LLC*, 380 F. Supp. 3d 1190, 1205 (N.D.
Fla. 2019) (citing *Fish v. Adams*, 401 So. 2d 843, 845 (Fla. 5th DCA 1981)).

Despite the foregoing Confidentiality Policy and common law duty to
maintain the confidentiality of Plaintiffs' confidential business information,
Defendants misappropriated Plaintiffs' confidential business records in furtherance
of their competing business in the days and months leading up to their planned
resignation from Crestview Pharmacy. Specifically, Mrs. Densman admitted to
forwarding at least 20 emails containing Plaintiffs' financial statements and client
lists in the period between March 3, 2023, and April 14, 2023. (Tr. 192-195; Pl. Ex.
14.) Importantly, these emails were forwarded after Mrs. Densman had announced
her intention to resign from her employment at Crestview Pharmacy on February 14,
2023, and while she still remained actively employed at Crestview Pharmacy. (Tr.
193; Pl. Ex. 6.) While Mrs. Densman now claims that the emails in question were
either forwarded by "accident" or "to have them on record," Mrs. Densman's actions
should be seen for what they are—a blatant attempt to misappropriate Plaintiffs'
confidential trade secret information in furtherance of her competing venture. (Tr.
145, 194.) Such disingenuous "explanations" tend to cast complete doubt upon Mrs.
Densman's credibility and actual motives.

25

Mrs. Densman's story that she forwarded the Top Provider email accidentally, while searching for emails from Jim Cox is belied by that fact that this email was the only document forwarded by Mrs. Densman on April 14. (Tr. 145-47.) If she, in fact, had been collecting all emails from Mr. Cox as she testified, there would have been additional emails forwarded at that time. Instead, the screenshot of Mrs. Densman's email inbox provided by her counsel reflects that no additional emails were forwarded on April 14, 2023. (Pl. Ex. 14.) The absence of any such emails is telling. It is clear that on the eve of her planned departure from Crestview Pharmacy, Mrs. Densman sought to gather confidential trade secret information concerning Plaintiffs' business (i.e., the Top Provider list) in order to obtain an unfair competitive advantage vis-à-vis Plaintiffs.

Testimony elicited during the Evidentiary Hearing confirms that not only did Mrs. Densman improperly forward Plaintiffs' trade secret information, but she has used that information to Plaintiffs' detriment. Specifically, Mrs. Densman admitted to immediately "contact[ing]" and having "lots of conversations" with the providers on the Top Providers list. (Tr. 155-56.) Moreover, she testified that Crestview City Pharmacy began servicing many of these same providers on April 24, 2023. (Tr. 185.) Mrs. Densman's claim that the Top Provider list was forwarded by "accident" simply is not credible.

The evidence obtained during the Evidentiary Hearing demonstrates that Plaintiffs have a likelihood of success on their trade secret misappropriation claims, given Defendants' wrongful taking and use of that information to unfairly compete.

### 2. Plaintiffs Are Likely to Succeed as to their Breach of Duty of Loyalty Claim

Florida law is clear that "an employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment." *Mortg. Now, Inc.,* 2010 U.S. Dist. LEXIS, at *22-23 (quoting *Fish v. Adams*, 401 So.2d 843, 845 (Fla. 5th DCA 1981)). Here, the record evidence demonstrates that Defendants disregarded their duty of loyalty to Plaintiffs and sought to actively compete with Plaintiffs during their employment.

For instance, for the reasons set forth immediately above in Section III.A.1, it is clear that Defendants have used, and are currently using, Plaintiffs' misappropriated trade secret information concerning Plaintiffs' Top Providers in order to unfairly compete with Plaintiffs.

Witness testimony confirms that Defendants intentionally interfered with Plaintiffs' efforts to enter into Non-Disclosure Agreements with employees at Crestview Pharmacy in late October 2022, including by directing employees not to sign the Non-Disclosure Agreement, instructing employees to notify Plaintiffs that

27

they needed legal counsel from Mrs. Densman's attorney before signing the Non-Disclosure Agreement, and providing employees with information from Mrs. Densman's attorney concerning the Non-Disclosure Agreement. (Tr. 208-11.) Given that Defendants already had formed Crestview City Pharmacy on October 17, 2022 (Pl. Ex. 7), with the intention of opening a competing pharmacy, it is clear that Defendants' efforts in this regard were done for the purpose of soliciting Crestview Pharmacy employees to join their competing venture. (Tr. 208.)

Defendants' efforts, while still employed at Crestview Pharmacy, to solicit fellow Crestview Pharmacy employees, are well documented. Defendants admit that it was widely known and discussed amongst employees that Defendants were planning to open a nearby competing pharmacy. (Tr. 127-28, 197, 207, 241.) Moreover, Defendants concede that they made statements that gave the impression that the employees would be joining Defendants at Crestview City Pharmacy. (Tr. 180, 198, 208.)

Defendants' assertion that these statements did not constitute employee solicitations is unsupported both by the record evidence and objective common sense. Indeed, the Florida pharmacy license issued to Mrs. Densman confirms that as of February 2023, Crestview Pharmacy Pharmacist Emily Blackmon had been offered the position of General Manager for Crestview City Pharmacy. (Pl. Ex. 8.) Moreover, in furtherance of that license, both Mrs. Densman and Ms. Blackmon

would have signed an application attesting to Ms. Blackmon's competing position with Crestview City Pharmacy, all while still employed by Crestview Pharmacy. (Tr. 53.)

Additionally, testimony from Certified Pharmacy Technician, April Koski, confirms that Mr. Densman was open about, and regularly discussed, Defendants' plans to open a competing pharmacy, to have Ms. Koski and other Crestview Pharmacy employees join them at Crestview City Pharmacy, and to covertly work with Bryan Henderson to transfer clients to Crestview City Pharmacy. (Tr. 208, 211.) Thus, the evidence confirms Defendants' efforts to solicit employees for the benefit of their competing business, while actively employed by Plaintiffs. Any attempt of Defendants to deny these facts is not only belied by the evidence but provides its own evidence of Defendants' knowledge that their actions were wrongful.

The evidence further establishes that Defendants' improper solicitation efforts were successful. Immediately following the termination of Defendants' employment, all but one of the employees at the Crestview Pharmacy whom Defendants had been improperly soliciting walked off the job either without notice or with two weeks' notice of intention to resign. (Tr. 69-72.) Moreover, the majority of these individuals are now employed by Defendants at Crestview City Pharmacy, consistent with Defendants plan as far back as October 2022. (Tr. 76-78, 164-68.)

Thus, Defendants presently are benefiting from their improper solicitation of Crestview Pharmacy's employees. Such unfair competition should not be permitted to continue as it has and will continue to cause irreparable harm to Plaintiffs.

### 3. Plaintiffs Are Likely to Succeed on their Civil Conspiracy Claim

A civil conspiracy claim requires the showing of: (1) a conspiracy between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act in furtherance of the conspiracy, and (4) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *See Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006) (citation omitted). The existence of a civil conspiracy and an individual's participation "may be inferred from circumstantial evidence." *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008) (internal quotation omitted).

As demonstrated above, Defendants jointly were engaged in a conspiracy to undermine Crestview Pharmacy's business, while actively employed at Crestview Pharmacy to unfairly secure customers and employees for their new competing venture. Among other things, the record evidence confirms that Defendants: (1) coerced Crestview Pharmacy employees to not sign the Non-Disclosure Agreement (Tr. 163, 208-09), (2) solicited those same employees to leave their employment with Crestview Pharmacy and accept competing employment at Crestview City Pharmacy (Tr. 52-53, 180, 197-198, 207, 211), and (3) misappropriated Plaintiffs'

trade secret information, including but not limited to, a list of Crestview Pharmacy's "Top Providers," many of whom Defendants conveniently are now servicing to Plaintiff's detriment (Pl. Exs. 9, 9(a)-(c), 14). The evidence further shows that Defendants orchestrated an intentional slowdown of work at Crestview Pharmacy, through numerous documented acts, in the days immediately prior to their planned resignation in order to sabotage Crestview Pharmacy's operations and its relationships with its existing prescribing physicians. (Tr. 85-86, 118-19, 223-24, 237-39.)

While simply planning to open a competing business is not in itself unlawful, Defendants did much more than simply plan to compete. They affirmatively acted in numerous wrongful ways, during their employment at Crestview Pharmacy, for the purpose of enhancing their own competing business to the detriment of Plaintiffs' business. There can be no legitimate reason for Defendants' collusive misconduct, which has harmed, and will continue to harm, Plaintiffs absent injunctive relief.

### B.   <u>Plaintiffs Have Shown that Absent Injunctive Relief They Will Suffer Irreparable Harm</u>

The record evidence demonstrates that Plaintiffs have been, and will continue to be, irreparably harmed by Defendants' disclosure or use of Plaintiffs' confidential and proprietary trade secrets information. *See, e.g., SMS Audio, LLC v. Belson*, No. 9:16-cv-81308-MIDDLEBROOKS, 2016 U.S. Dist. LEXIS 195790, at *14-15 (S.D. Fla. Aug. 15, 2016) (finding plaintiff's business was likely to be irreparably injured

in defendants were not enjoined from using plaintiff's trade secrets and confidential information to compete with plaintiff); *Hatfield v. AutoNation, Inc.,* 939 So. 2d 155, 156 (Fla. 4th DCA 2006) (misappropriated confidential information gave rise to irreparable harm).

It is well accepted that irreparable harm occurs when there is a threatened or actual loss of clients, employees, or goodwill, particularly where actions by former employees can irreversibly change the status quo. *Confianca Moving, Inc.,* 2011 U.S. Dist. LEXIS, at 20 (quoting *Se. Mech. Services, Inc. v. Brody*, No. 8:08-cv-1151-T-30EAJ, 2008 U.S. Dist. LEXIS 112332, at *15 (M.D. Fla. Oct. 15, 2008) ("There is a need for immediate injunctive relief when employers are threatened by conduct of former employees that would 'irreversibly alter the status quo.'").

Here, the harm Plaintiffs are facing is ongoing and will only increase with the passage of time. Defendants (1) have formed a nearby, directly competing business (i.e., Crestview City Pharmacy); (2) stole and remain in possession of Plaintiffs' customer and financial trade secret information, including Plaintiffs' Top Provider list; and (3) have admitted to using this information to compete with Plaintiffs, including to solicit Plaintiffs' business providers to leave Crestview Pharmacy in favor of Crestview City Pharmacy. Absent injunctive relief from this Court, Plaintiffs will continue to be harmed by Defendants' use of this information to

Plaintiffs' detriment, including the irreparable loss of further customers prior to a full trial on the merits.

As discussed in the Emergency Motion, Defendants' conduct harms Plaintiffs in a variety of ways, many of which cannot be adequately addressed by awarding monetary or other damages. A money judgment will restore neither Plaintiffs' relationships with its employees and customers, nor its goodwill and reputation. *See, e.g., All Leisure Holiday LTd. V. Novello*, No. 12-62328-CIV-ROSENBAUM, 2012 U.S. Dist. LEXIS 168774, at *14 (S.D. Fla. Nov. 27, 2012) (granting temporary restraining order because "'the loss of customers and goodwill is an 'irreparable' injury'") (quoting *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir.1991)); *Allied Universal Corp. v. Given*, 223 So. 3d 1040, 1044 (Fla. 3d DCA 2017) (entering temporary injunction where plaintiff would suffer irreparable harm if defendant were to use its customer information, relationships, and strategies with his new employer). Because the harm being inflicted here is irreparable, a preliminary injunction should be entered to preserve the status quo pending a ruling on the merits.

## C.   **Plaintiffs Will Suffer the Greater Harm Absent an Injunction**

As articulated above and in the Emergency Motion, the harm that Defendants have caused to Plaintiffs' business is real, ongoing, and likely to increase absent injunctive relief. Conversely, Defendants face no legitimate harm if enjoined from

further unfair competition using Plaintiffs' improperly solicited employees and misappropriated trade secrets (e.g., the Top Providers list and private financial information).

By this action, Plaintiffs do not seek to prevent *lawful* competition. Plaintiffs have not requested that the Court order Defendants to cease operations (not withstanding Defendants admitted wrongful scheme to benefit themselves and harm Plaintiffs). Rather, Plaintiffs simply seek, by their Emergency Motion, protection from further harm caused by Defendants' unfair competition with respect to Plaintiffs' improperly solicited employees, providers and customers.

Given these considerations, the balancing of the harms weighs strongly in Plaintiffs' favor. *Everest Nat'l Ins. Co. v. Rockhill Ins. Co*., No. 8:16-cv-2803-T-35JSS, 2016 U.S. Dist. LEXIS 189685, at * 16 (M.D. Fla. Oct. 5, 2016) ("the Court finds that the balancing of harm favors [Plaintiff] in this matter because the Court has been presented with evidence that Defendant … has absconded with confidential information and trade secrets and has taken employment with a direct competitor.").

**D.     Public Interest Will be Furthered by Preventing Further Unfair Competition by Defendants**

Moreover, for the reasons set forth in the Emergency Motion, the public interest will be served by the Court's entry of an order protecting Plaintiffs' business and trade secrets from further unfair competition by Defendants. *Hatfield v. AutoNation, Inc.,* 939 So. 2d 155, 158 (Fla. 4th DCA 2006) ("the existence of

Florida's trade secret statute illustrates our state's interest in protecting businesses from theft of confidential information."); *East v. Aqua Gaming*, 805 So. 2d 932, 934 (Fla. 2d DCA 2001) ("[A]n injunction prohibiting a former employee from using trade secrets to solicit existing customers clearly does not disserve the public interest of protecting legitimate business interests."). It is manifestly in the public interest that courts protect parties who are victims of wrongful actions, like those of Defendants.

### E.  The Court Should Deny Defendants' Bond Request

While Defendants may seek the posting of a bond, the "amount of an injunction bond is within the sound discretion of the district court." *Carillon Imps., Ltd. V. Frank Pesce Int'l Grp.*, Ltd., 112 F.3d 1125, 1127 (11th Cir. 1997). As such, "the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (internal citations omitted). Here, the Court should exercise its discretion to deny any request that Plaintiffs post bond.

Plaintiffs have a high probability of succeeding on the merits of their claims. Defendants have admitted to forwarding Plaintiffs' trade secret financial and Top Provider information and to soliciting Plaintiffs' employees, all while employed by Plaintiffs. Such conduct constitutes an egregious breach of Defendants' fiduciary duty of loyalty and other common law duties to their employer, Crestview Pharmacy.

Accordingly, Defendants have no legitimate interest in their continued business dealings with customers about whom Defendants misappropriated Plaintiffs' trade secret information or the Crestview Pharmacy employees whom Defendants improperly solicited away to Crestview City Pharmacy.

There is no legitimately protectible harm that will flow to Defendants if the Court enjoins their continued unfair competition with Crestview Pharmacy. Defendants still would be permitted to operate; they simply would not have the benefit of the improperly obtained business (providers and customers) and employees with whom Defendants presently seek to do business. In this respect, an injunction order from this Court would put Defendants in the same position as any new business owner who is starting from scratch without a wrongfully obtained advantage, such as the confidential and proprietary information of another. Accordingly, the Court should exercise its discretion and deny any request that Plaintiffs post a bond. *See Harris v. Hous. Auth. of City of Daytona Beach*, No. 6:01-cv-254, 2001 WL 36404273, at *5 (M.D. Fla. Apr. 25, 2001) (not requiring a bond where the preliminary injunction would result in minimal potential harm to the defendant); *Univ. Books & Videos, Inc. v. Metro. Dade County*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999) (not requiring a bond where the movant had a high probability of succeeding on the merits of its claim).

## IV.   **CONCLUSION**

For the reasons set forth above, Plaintiffs Optio Rx, LLC and Crestview Pharmacy, LLC respectfully request that their motion for preliminary injunction be granted in all respects.

Dated: May 12, 2023                              Respectfully submitted,

**OPTIO RX, LLC & CRESTVIEW PHARMACY, LLC**


By: /s/ *Alexis M. Dominguez*

Aliette D. Rodz
ARodz@shutts.com
SHUTTS & BOWEN LLP
200 S. Biscayne Boulevard
Suite 4100
Miami, Florida 33131
Telephone: (305) 358-6300

Alexis M. Dominguez
adominguez@nge.com
(*admitted pro hac vice*)
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Suite 1700
Chicago, IL 60602-3801
Telephone: (312) 269-8000
Facsimile: (312) 269-1747

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on May 12, 2023, he caused the foregoing document to be electronically filed with the Clerk of Court using CM/ECF, which sent notification of such filing to all counsel of record.

<u>/s/ Alexis M. Dominguez</u>

## <u>CERTIFICATION OF WORD COUNT</u>

The undersigned counsel hereby certifies that the foregoing document contains 7984 words.

<u>/s/ Alexis M. Dominguez</u>

35208806.3