**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

OPTIO RX, LLC &
CRESTVIEW PHARMACY, LLC,

       Plaintiffs,

   v.

CRESTVIEW CITY PHARMACY, INC.,
JENNIFER RESHAY DENSMAN,
CHRISTOPHER NEIL DENSMAN &
BRYAN HENDERSON,

       Defendants,

AMANDA DAVEY, CLAUDIA
BARNETT, KARI WAITES, VICTORIA
BALLARD,
MORGAN MEEKS, KYNDALL
BARBER & ELLEN STAFFORD,

       Nominal Defendants.

Case No. 3:23-cv-08993-MCR-HTC

---

**POST-HEARING BRIEF OF DEFENDANTS JENNIFER RESHAY
DENSMAN, CHRISTOPHER NEIL DENSMAN, AND CRESTVIEW CITY
PHARMACY, INC. D/B/A "HOMETOWN PHARMACY" IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

Defendants Jennifer Reshay Densman ("Mrs. Densman"), Christopher Neil

Densman ("Mr. Densman"), and Crestview City Pharmacy, Inc. d/b/a Hometown

Pharmacy ("Hometown Pharmacy" and together with Mrs. Densman and Mr.

Densman, "Defendants"), by and through their undersigned counsel, submit this

post-hearing brief as requested by the Court, to provide closing argument regarding the issues addressed at the evidentiary hearing on May 5, 2023 ("Hearing") on the Motion for a Temporary Restraining Order and Preliminary Injunction ("Motion") filed by Plaintiffs Optio Rx, LLC ("Optio") and Crestview Pharmacy, LLC ("Crestview Pharmacy", and together with Optio, "Plaintiffs"), as follows:

## I.   <u>INTRODUCTION</u>

Only two questions remain before the Court on Plaintiffs' Motion[1]: (1) whether Defendants should be enjoined from doing business with the providers whose names are included on Plaintiffs' summer 2022 "Top Provider List," despite no evidence that those names qualify as trade secrets and even if these providers choose to contact Defendants on their own accord and without solicitation by Defendants; and (2) whether Defendants should be enjoined from employing former Crestview Pharmacy employees who left their employment with Crestview Pharmacy voluntarily, after Plaintiff Optio withheld typical bonuses and informed those employees they would be terminated if they refused to agree to onerous new restrictive covenants (the "Noncompete Agreement", Pl. Ex. 2).

---

[1] Plaintiffs' Post-Hearing Brief (Dkt. 30) concedes that the parties' stipulations have "greatly narrowed" the issues and states that the injunctive relief they now seek is limited to (1) enjoining Defendants from soliciting *or doing business with* providers on Plaintiffs' 'Top Provider List' (Tr. 146:22-147:5) and (2) enjoining Defendants from employing or engaging *former* Crestview Pharmacy employees. (Dkt. 30, p. 3).

The answer to both questions is "no." Plaintiffs have not established a likelihood of success on the merits, irreparable harm, or any of the other requirements to support entry of an injunction.[2] To the contrary, the evidence shows that the Plaintiffs—including Optio, a national pharmacy conglomerate—are using the Court and the threat of an injunction to unfairly stifle competition and remove patient and provider choice, to restrict the free movement of labor and their employees' rights to organize, and to retaliate against their former employees for engaging in protected collective action.

Plaintiffs have not only failed to carry their heavy burden to establish a basis for injunctive relief, but they have ignored the Court's directive to focus their closing arguments on the relevant law in light of testimony from the Hearing.  (Tr. 245:12-22).  Instead, the bulk of Plaintiffs' Post-Hearing Brief ("Brief") (Dkt. 30) is devoted to rehashing their Complaint and Motion, while mischaracterizing testimony in order to conjure up a conspiracy out of reasonable acts of self-preservation taken by the Densmans and the Nominal Defendants.

The Densmans and the Nominal Defendants exercised their legal rights in the face of ongoing mismanagement, including Plaintiffs' ultimatum to sign onerous

---

[2] Plaintiffs' representation that Defendants somehow "indirectly acknowledged the presence of the applicable standard for preliminary injunctive relief" via stipulation (Dkt. 30, p. 2) is frankly ridiculous and Defendants disclaim any such intent, as the Joint Stipulation of record itself provides. (Dkt. 33, ¶10).

restrictive covenants or else be terminated.  Plaintiffs are now using litigation as a cudgel in an effort to obtain extensive restrictions that they were unable to obtain via informed consensual agreement.

In effect, Plaintiffs attempt to evade the results of their own mismanagement by asking this Court to enjoin the Defendants, as well as former employees who chose to terminate their at-will employment with the Plaintiffs' poorly managed and failing business, from supporting themselves in a new competing business. Such an injunction would result in improper and unfair restraints on trade, competition, and free movement of employees.

Accordingly, the Motion should be denied in its entirety.

## II.   <u>FACTUAL BACKGROUND</u>

### A.   <u>Plaintiffs' Ultimatum to Employees: You Will be Fired if You Do Not Sign the Noncompete Agreement</u>

Optio acquired Crestview Pharmacy in 2018.  (Tr. 33:6-9).  In September or October of 2022, Optio sent all of its employees nationwide, including the Densmans, an agreement with sweeping restrictive covenants. (Tr. 40:3-5; Pl. Ex. 2).  That agreement included a provision purporting to obligate employees, for one year following their separation from employment with Plaintiffs, not to:

> …directly or indirectly initiate, contact or engage in any contact or communication, of any kind whatsoever, that has the purpose or effect of inviting, assisting, encouraging or requesting any key vendor, supplier, licensor, consultant, strategic partner…or Customer

> to…purchase or use any products or services from me, my
> employer or any third party that are or may be competitive
> with [Plaintffs'] products or services….

(Pl. Ex. 2, ¶7.b.) (Pl. Ex. 2 referred to hereinafter as the "Noncompete Agreement").

Plaintiffs gave their employees an ultimatum—either sign the Noncompete Agreement, without any negotiation, or be terminated. (Tr. 100:4-9; 104:9-16). This so-called "rollout" was more like a steamroller that Optio attempted to use to force employees to agree to restrictive covenants that could effectively prevent them from working in the pharmacy business if their employment with Optio ended. (Pl. Ex. 2).

However, at the same time Optio was attempting to bind employees to the onerous Noncompete Agreement, they were also closing down pharmacies and not paying out typical bonuses. (Tr. 88:20-25; 187:11-19). Optio and Crestview Pharmacy made clear that anyone who declined to sign a Noncompete Agreement would not remain employed at Crestview. (Tr. 100:4-9; 104:9-16). Despite this ultimatum, nothing in the Noncompete Agreement changed those employees' "at-will" status so as to provide them any assurance of continued employment. (Pl. Ex. 2).

Prior to the "rollout" of the non-negotiable Noncompete Agreement, Mrs. Densman already had concerns about Optio's policies, practices, and management of Crestview Pharmacy. Earlier in 2022, Plaintiffs had not paid Crestview

employees mid-year bonuses, which they were used to receiving. (Tr. 187:11-19). Mrs. Densman had even offered to give up her bonus so that other Crestview employees could receive one. (*Id.*). Jim Cox, at that time Optio's Chief Operating Officer, assured Mrs. Densman that she and the other Crestview employees "would be taken care of at the end of the year." (Tr. 146:16). However, he was involuntarily terminated from Optio in October, before the end of the year. (Tr. 106:8-22). In addition, Mrs. Densman and other employees were also fearful of the implications of Optio's "push for…Optio 2.0, with prescriptions leaving to go to a hub" and what that would mean for their jobs. (Tr. 186:10-17).

Mrs. Densman declined to sign the Noncompete Agreement.  Instead, Mrs. Densman decided to form a new pharmacy business, and incorporated Crestview City Pharmacy, Inc. on October 17, 2022. (Tr. 136:10-13).  On February 14, 2023, after receiving approval of her pharmacy license application from the State of Florida, Mrs. Densman gave six weeks' notice to Crestview that her last day would be March 31, 2023.  (Tr. 48:11-13; 51:19-27; 98:13-99:24).  However, Andrew Charter, Optio's Chief Pharmacy Officer, asked Mrs. Densman to stay with Crestview through April 21, 2023 to support Crestview Pharmacy's transition to a replacement, which she agreed to do.  (Tr. 98:13-99:24).

By that time, both Optio and Crestview employees, including Mr. Charter, knew that Mrs. Densman was leaving Crestview to start her own pharmacy business.

(Tr. 197:20-23). Within the weeks prior to her anticipated last day, Mr. Charter was speaking with the other Crestview employees, including all the pharmacy technicians and the other two pharmacists, about whether they wanted to stay at Crestview, and making offers for increased pay or bonus incentives. However, those offers were still conditional on execution of the Noncompete Agreement. (Tr. 100-102).

### B. Optio's Surprise Termination of the Densmans

Optio abruptly terminated Mrs. Densman on April 20, 2023, the day before her previously-agreed last day, by sending its legal counsel in unannounced with Mr. Charter to Crestview to terminate her in person. (Tr. 87:11-15). Optio also terminated Mr. Densman that same day, by telephone, when he was away from the store on an errand. (Tr. 170:23-171:10).  It then immediately sent the Densmans a "cease and desist" letter.  (Tr. 65:2-5; 98:13-99:25; 112:1-7; Pl. Ex. 11a).

Mr. Charter admitted that even prior to April 20, 2023, Crestview had suffered from understaffing, which was causing prescription fulfillment delays. (Tr. 120:22-121:11). Following the surprise visit of Optio's lawyer and in-person termination of Mrs. Densman, several of the Nominal Defendants resigned either immediately or via letters of resignation. (Tr. 72:7-20).  None of them had signed Plaintiffs' onerous Noncompete Agreement.  By not accepting Plaintiffs' ultimatum, the writing was on the wall for these at-will employees—they had been informed that the consequences

of such refusal would be termination, and they were subject to termination at Plaintiffs' whim.  (Tr. 162:23-163:23).

Furthermore, although Crestview Pharmacy had depended upon Mrs. Densman's qualifications and licensing to fulfill prescriptions in other states, there is no evidence that they did anything to ensure a replacement from the time she gave notice in mid-February until she was terminated on April 20, 2023. Following that termination, Plaintiffs surrendered more than thirty state licenses.  (Tr. 92:16-93:1; 117:11-118:7; 130:2-5).

Crestview City Pharmacy, Inc., d/b/a Hometown Pharmacy, did not open for business or begin receiving or filling prescriptions until April 24, 2023, after both Mrs. and Mr. Densman were terminated. (Tr. 185:18-15).  Plaintiffs have offered no evidence to the contrary.  Furthermore, the new pharmacy never did any business or displayed signage under the name of Crestview City Pharmacy, and instead immediately filed paperwork with the Florida Secretary of State to operate under the fictitious name "Hometown Pharmacy," followed by filing amended articles of incorporation to completely change its legal name to "Hometown Pharmacy, Inc." (Tr. 214:16-24; 185:18-15; Dkt. 33).

### C. The "Top Provider List"

The Top Provider List (or "List") was a report run by Mrs. Densman at the request of Optio's then-EVP of Operations Matt Sesto on September 6, 2022, of

Crestview's "Top 20" prescribers for the period of the report, from June 1, 2022, to August 31, 2022. (Pl. Exs. 9, 9A). Mr. Charter testified that Optio considers at least some of the information in that report confidential, although he did not testify that Optio considers the names of the providers to be confidential. (Tr.55:22-57:5). Defendants deny having used or disseminated the Top Provider List and have stipulated that they will not use the List. (Tr. 251:11-252:15). Mrs. Densman testified that she had forwarded the list to herself by accident and deleted it shortly afterwards. (Tr. 146:22-147:5l; 182:11-15).

Accordingly, the only remaining issue is whether Defendants should be enjoined from doing business with providers on the Top Provider List—even if the providers contact Defendants of their own accord. Mr. Charter conceded that (1) the compounding pharmacy business is different than the retail pharmacy business, in that providers and patients work more closely with the individual pharmacists and develop relationships with them (Tr. 33:23-34:22); (2) customers stopped doing business with Crestview Pharmacy because it was taking too long to fill prescriptions (Tr. 81:4-10); (3) he could not identify any quantifiable business impact from loss of patients or prescribers (Tr. 83:9-15); (4) he was unsure any providers who had stopped doing business with Plaintiffs would come back if Defendants were enjoined from doing business with them (Tr. 84:10-22); (5) he could not identify *any* providers who had ended their relationships with Plaintiffs because Defendants

asked them to (Tr. 117:3-8); and (6) he was not aware of any prescriptions having been transferred from Crestview Pharmacy to Defendants (Tr. 230:13-15).

While Mrs. Densman testified that she has been in contact with providers who appear on the List, some of the providers have reached out to her on their own accord, and all of these conversations took place after her employment was terminated on April 20, 2023.  (Tr. 155:19-156:21).  Mrs. Densman also testified that providers asked for her by name (Tr. 183:9-11), that many providers were reaching out to her (Tr. 155:19-156:21), that she was already familiar with the providers on the List based on her work experience—which began long before Optio bought Crestview Pharmacy—and that she would have been able to contact them even without reference to the List. (Tr. 151:17-19; 182:15-18).

### D. **Defendants' Employment of Former Crestview Pharmacy Employees**

Mrs. Densman testified that she did not offer employment to any Crestview Pharmacy employees prior to her termination on April 20, 2023. (Tr. 179:19-25). She acknowledged that she "may" have previously discussed the possibility of employment at Hometown, although she did not have any specific recollection of doing so, and thought it possible that the other employees may have interpreted her reassurances that "better days are coming" as a job offer.  (Tr. 180:3-14; 186:1-8; 205:24-206:11).

None of the former Crestview Pharmacy employees who are now working with Hometown Pharmacy elected to sign Plaintiffs' Noncompete Agreement. (Tr. 162:23-163:23). Nothing in the record shows that these employees quit because they were "solicited" by the Densmans before April 20, 2023, and Mr. Charter conceded that he had no direct evidence of any such solicitation. (Tr. 116:8-9; 122:6-21; 123:15-124:1). Indeed, despite knowing that Mrs. Densman was leaving Crestview Pharmacy and intended to open her own pharmacy, Plaintiffs still made the incentives they offered to other employees conditional on execution of the Noncompete Agreement, and did not offer to guarantee continued employment even if those employees were to sign. (Tr. 100-102; Pl. Ex. 2).

Mrs. Densman testified that a number of Crestview Pharmacy employees, whom she considered friends, had been dissatisfied for at least a year before April 20, 2023, because of the Noncompete Agreement, lack of expected bonuses, and fearfulness over their job security. (Tr. 186:6-17). The record suggests[3] that there was a general sense of frustration among Crestview employees over the Noncompete Agreement and Optio's management decisions, in addition to staffing shortages at the pharmacy, and that those factors contributed to the employees' decisions to quit

---

[3] Although most of the Nominal Defendants appeared for the May 5, 2023 hearing, Plaintiffs did not elect to call any of them as witnesses.

once their friends and colleagues were abruptly terminated.  (Tr. 109:17-25; 183:12-184:20).

## III.    <u>ARGUMENT</u>

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to all four elements."  *Davidoff & CIE, SA v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2011) (internal citation omitted).   In order to obtain a preliminary injunction, movants must demonstrate:

1. A substantial likelihood of success on the merits;

2. Irreparable harm to the Plaintiffs absent an injunction;

3. That the threatened injury to the Plaintiffs outweighs the harm to Defendants if the injunction issues; and

4. That the injunction will not disserve the public interest.

*USF Fed. Credit Union* v. *Gateway Radiology Consultants, P.A. (In re Gateway Radiology Consultants, P.A.)*, 983 F.3d 1239, 1254 (11th Cir. 2020).   For the following reasons, Plaintiffs have failed to demonstrate that they have met the necessary requirements to obtain a preliminary injunction in this case.

The testimony of Plaintiffs' witnesses Mr. Charter and April Koski—who, as Plaintiffs' employees, very clearly have their paychecks tied to the content of their testimony—makes clear that Plaintiffs are not likely to succeed on the merits of the

claims at issue on this Motion, and that if any damages have been sustained by Plaintiffs, those damages have already occurred and are completely self-inflicted based on the ultimatum that Plaintiffs gave to their workforce and other mismanagement by Plaintiffs.

Instead, Plaintiffs' Motion to enjoin Mr. and Mrs. Densman from filling prescriptions and employing their friends at a pharmacy in the Densmans' own hometown is a blatant and improper attempt to stifle legitimate competition. This is confirmed by the testimony of Mr. Charter, who told the Densmans that there would be repercussions and consequences if they opened their pharmacy, even stating that, "You can sue anyone for anything." (Tr. 49:25-50:4; 113:16-114:6). If the injunction is granted, the Densmans and their employees, who are not and never were parties to any restrictive covenants with Plaintiffs, will be prevented from engaging in the pharmacy business.

What Plaintiffs describe as a plot to undermine their business is really the foreseeable result of Plaintiffs' own decisions and actions. At the time Optio required its employees either to sign the Noncompete Agreement or face termination, it had already begun closing down stores, and stopped paying bonuses that Crestview's employees had come to expect. (Tr. 88:21-25; 187:11-19). Predictably, many employees—the Densmans included—saw the writing on the wall and took lawful steps to ensure their ability to support themselves.

The evidence establishes that the Densmans did not begin operating their pharmacy—meaning actually doing business—until *after* their employment with Plaintiffs was terminated. Furthermore, as the Plaintiffs concede, Mrs. Densman had submitted her resignation letter on February 14, 2023, but agreed to stay on until April 21, 2023 at the request of Mr. Charter, only to be fired abruptly on April 20, 2023. Indeed, rather than stealing trade secrets or engaging in unfair competition, Mr. and Mrs. Densman were attempting to protect themselves by (1) forming a new business, Hometown Pharmacy, when they had been informed they would be terminated if they opted not to sign the Noncompete Agreement without any assurance of continued employment (Tr. 136:10-13), and (2) forwarding correspondence related to what appeared to be financial irregularities at Crestview Pharmacy, and correspondence with Jim Cox related to unpaid compensation. This correspondence mistakenly included a copy of a Crestview Pharmacy Top 20 Provider list, which Mrs. Densman immediately deleted once she realized her error. (Tr. 146:20-147:5, 187:6-188:15). None of this was controverted by Plaintiffs at the Hearing, while the testimony of the Defendants was sincere and credible.

### A. **Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits**

#### 1. *No Misappropriation Of Trade Secrets in Violation of DTSA and FUTSA*

To establish a claim of trade secret misappropriation under DTSA, Plaintiffs must "plausibly allege that [they] (i) 'possessed information of independent economic value' that (a) 'was lawfully owned by' the plaintiff[s]and (b) for which the plaintiff[s]'took reasonable measures to keep secret,' and (ii) the defendant[s]'used and/or disclosed that information,' despite (iii) 'a duty to maintain its secrecy.'" *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1293 (M.D. Fla. 2018); (citing *Primo Broodstock, Inc. v. Am. Mariculture, Inc.*, 2017 WL 1502714, at *11 (M.D. Fla. Apr. 27, 2017) and *American Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998)). To prevail on a claim under FUTSA, Plaintiffs must show that (1) they possessed a trade secret and (2) the secret was misappropriated. *Keep Santa Rosa Beautiful Inc. v. Butterflies in Motion, Inc.*, Docket No. 3:22-cv-1572-MCR-MJF, 2022 U.S. Dist. LEXIS 240117, at *9 (N.D. Fla. Dec. 5, 2022). A trade secret is defined as information that derives independent value from not being generally known, and is the subject of reasonable efforts to maintain its secrecy. *Id.*

Courts have analyzed DTSA and FUTSA claims together, as they are nearly identical. *Matrix Health Grp. v. Sowersby*, No. 18-61310-CIV, 2019 U.S. Dist.

LEXIS 173534, at *17 (S.D. Fla. Oct. 6, 2019).  Accordingly, to be successful on both claims Plaintiffs must demonstrate (1) that the information in question constitutes a 'trade secret' in the first place; (2) that they took reasonable steps to protect that information; and (3) that the information was actually misappropriated." *Id.*

Here, Plaintiffs have failed to present evidence to satisfy any of these elements, much less carried their heavy burden of showing that there is an ongoing risk that the Defendants will use the Top Provider List.

### a. No Evidence that Provider Names are Trade Secrets

Critically, Florida courts have consistently held that, in the absence of a non-compete agreement, former employees cannot be prohibited from utilizing contacts and expertise gained during their former employment. *See, e.g., Templeton v. Creative Loafing Tampa, Inc.*, 552 So.2d 288 (Fla. 2d DCA 1989). They distinguish legitimate trade secrets as those developed by a former employer via the proven expenditure of expense and effort, as opposed to a former employee's relationship with customers.  *See, e.g., American Red Cross*, 143 F.3d 1407; *Everest Nat'l Ins. Co. v. Rockhill Ins. Co.*, No. 8:16-cv-2803-T-35JSS, 2016 U.S. Dist. LEXIS 189680, at *13 (M.D. Fla. Nov. 10, 2016) ("there is no basis for Everest to prevent [former] employees from using the business relationships and contacts that they have

developed during the course of their employment with Everest to solicit new business for Rockhill, even from Everest policy holders that are known to them.")

Plaintiffs have presented no evidence that the names on the Top Provider List are trade secrets. Mrs. Densman testified that she was already familiar with the providers on the List based on her work experience—which began years before Optio bought Crestview Pharmacy—and knew who the providers are even without the List. (Tr.151:17-19; 182:15-18).

Plaintiffs have failed to meet their burden because they presented no evidence that Defendants have used the Top Provider List, and indeed, they agreed not to use it (and have destroyed or will destroy all copies pursuant to the parties' stipulation), rendering any basis for the injunction moot. (Tr. 251:11-252:15).

Finally, Plaintiffs did not present any evidence at all to explain what expense and effort they expended to develop or obtain any of their providers, the methods by which the List was created, the steps Plaintiffs took to ensure the secrecy of the names on the List, and their potential value to competitors.

Accordingly, Plaintiffs have not shown that any provider names are protectible trade secrets.

     b. <u>No Evidence that Plaintiffs Made Reasonable Efforts to Protect the Top Provider List</u>

Plaintiffs also fail to describe what reasonable efforts, restrictions, or protective mechanisms they had in place to protect the provider identities, which is

fatal to their claims. *See*, *M.C. Dean, Inc. v. City of Miami Beach*, 199 F. Sup. 3d 1349, 1357 (S.D. Fla. 2016).

A plaintiff cannot state a claim for misappropriation of trade secrets where the plaintiff has failed to take "any steps to safeguard its trade secrets between" itself and the defendant. *Surfaces, Inc. v. Point Blank Enters., Inc.*, No. 20-62648-CIV-SMITH, 2022 U.S. Dist. LEXIS 231881, at *14 (S.D. Fla. Dec. 27, 2022). Reasonable efforts to protect trade secret information have been held to include requiring confidentiality agreements in order to access information, password protecting systems used to distribute information, using licensing agreements, including confidentiality provisions in contracts, installing multi-tiered password systems, compartmentalizing information to prevent employees from accessing all types of confidential information, and providing elevated security levels to certain employees. *See, Serrala US Corp. v. James Paschke & Paschke Consulting, Inc.*, No. 3:21cv907-TKW-EMT, 2022 U.S. Dist. LEXIS 112541, at *10-11 (N.D. Fla. May 16, 2022) (reasonable measures to protect information included confidentiality agreements and password-protected access to systems distributing information); *Mapei Corp. v. J.M. Field Mktg.*, 295 So. 3d 1193, 1199 (Fla. 4th DCA 2020) (reasonable measures to protect information included password-protecting website, licensing agreements, and confidentiality provisions in contracts).

Here, Plaintiffs have failed to offer any proof that they made any effort whatsoever to protect any provider names, or even the Top Provider List itself, as trade secrets. First, the only restrictions or safeguards are contained in an employee handbook (which was never signed by Mrs. Densman) that related to password-protected access to personal heath information, and which does not include the List. (Tr. 36:10-20; 154:13-18).

Second, neither the List nor the email attaching the List are marked as "confidential," or otherwise labelled to indicate that the information therein is protected, is a trade secret, or treated differently from any other information. Pl. Ex. 9a. Accordingly, Plaintiffs have not demonstrated that they took reasonable measures to protect their purported trade secret information.

### c. Defendants Did Not Misappropriate the Top Provider List

"Misappropriation occurs when a trade secret is acquired 'by someone who knows or has reason to know that the secret was improperly obtained or who used improper means to obtain it.'" *Fin. Info. Techs., LLC v. Icontrol Sys. USA, LLC*, 21 F.4th 1267, 1273 (11th Cir. 2021). Plaintiffs have failed to offer evidence that Defendants knew or had reason to know that the Top Provider List itself, or the identities of the providers named in it, were obtained improperly.

Accordingly, Plaintiffs have failed to show a likelihood of success on their claims under the FUTSA and DTSA.

## 2. *Defendants Did Not Breach any Duty of Loyalty*

"The elements of a claim for breach of the duty of loyalty are: (i) the existence of a duty of loyalty; (ii) a breach by the defendant of that duty of loyalty; and (iii) damages incurred by the plaintiff flowing from the defendant's breach of the duty of loyalty." *Creative Touch Interiors, Inc. v. Spade*, 2015 Fla. Cir. LEXIS 73186, *9 (citing *Cassedy v. Alland Investments Corp.*, 128 So. 3d 976, 978 (Fla. 1st DCA 2014)).

Preparing to open a competing business, even while still employed, does not violate an employee's duty of loyalty. *Harllee v. Professional Service Industries*, 619 So. 2d 298, 300 (Fla. 1st DCA 1992) (citing *Fish v. Adams*, 401 So. 2d 843, 845 (Fla. 5th DCA 1981)). *See also*, *Furmanite America, Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1149 (M.D. Fla. 2007) ("an employee does not violate his duty of loyalty when he merely organizes a competing business during his employment to carry on a rival business after the expiration of his employment. Mere preparation to open a competing business, such as assisting in the opening of a bank account, the obtaining of office space and other services with respect to the future employer are likewise insufficient to demonstrate a breach of such duty.")

Plaintiffs are unlikely to succeed on the merits of their breach of loyalty claim because the claim rests on the Densmans' formation of a new business, as well as the steps required to operate a pharmacy business (i.e., registering it with state and

federal authorities, etc.). However, Hometown did not open for business until *after* Mrs. Densman was terminated, and Plaintiffs offer no evidence to the contrary.

As for Plaintiffs' claims that the Densmans improperly solicited employees while they were still employed with the Plaintiffs, it is difficult to fathom how Defendants could have breached their fiduciary duty by agreeing to hire former "at will" employees of Crestview Pharmacy who resigned and began working with Hometown, when it was the Plaintiffs that decided to inform every employee—its entire workforce—at the same time, that they would be fired if they did not sign the onerous Noncompete Agreement. (Tr.72:7-20; 162:23-163:23; 165:9-168:3). There is also an utter lack of evidence that any former employees chose to terminate their employment with Crestview because of improper solicitation by the Densmans. While Plaintiffs attempt to blame the Densmans for employees leaving, the fact of the matter is that the writing was on the wall for the employees from the moment Plaintiffs presented their ill-conceived "rollout" of the Noncompete Agreement to employees under threat of termination, rather than for a bonus or some new consideration, just as Plaintiffs were closing pharmacies and communicating a plan to send prescriptions away from Crestview and other local pharmacies to "hubs" to be compounded and filled.

As for the allegation that the Densmans retained counsel to review the Noncompete Agreement and had discussed the legal advice they received with other

employees, such facts, even if true, are insufficient to state a claim for breach of any legal duty. Indeed, employees have a right to organize, share views and opinions, and when faced with an onerous, non-negotiable Noncompete Agreement that was presented as an ultimatum, it was only natural that they would do so. Plaintiffs' suggestion that it was improper for the Densmans to share legal advice they received with other employees in the same position, shows that the Plaintiffs were attempting to take advantage of their position and prevent employees from organizing. *See*, *Diaz v. Hartman & Tyner, Inc.*, No. 12-60978-MC-ZLOCH, 2012 U.S. Dist. LEXIS 92459, at *2, note 1. (S.D. Fla. June 29, 2012) (discussing that "sections 8(a)(1) and (3) of the National Labor Relations Act" "make it an unfair labor practice for an employer to 'interfere with, restrain or coerce employees in the exercise of the[ir collective bargaining] rights'"); *Mercedes-Benz U.S. Int'l, Inc. v. Int'l Union, UAW*, 838 F.3d 1128, 1130-31 (11th Cir. 2016) ("Section 7 of the [National Labor Relations] Act grants employees affirmative rights such as the right to self-organize, to bargain collectively, 'and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.' Section 8 of the Act defends the Section 7 rights by prohibiting an employer's 'interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in [Section 7].'")

As for the alleged use and dissemination of trade secrets, Defendants have not used, and have stipulated not to use, the alleged "trade secret" information. (Tr. 251:11-252:15).

Accordingly, Plaintiffs are unlikely to succeed on their cause of action for breach of duty of loyalty.

### 3. *No Civil Conspiracy*

The elements of a civil conspiracy are: "(1) the existence of an agreement between two or more parties; (2) to do an unlawful act; (3) the doing of some overt act in furtherance of the conspiracy; and (4) damages." *Debose v. University of South Florida Board of Trustees*, 811 F. App'x 547, 556 (11th Cir. 2020). Assertions based on speculation are not sufficient. *Id.* "Under Florida law, the gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is done through the conspiracy which results in injury to the Plaintiff." *Grayson v. No Labels, Inc.*, Docket No. 22-11740, 2022 U.S. App. LEXIS 29325, at *8 (11th Cir. Oct. 21, 2022).

Plaintiffs here cannot satisfy any of the elements of this claim. They offer only conclusory assertions that Defendants entered into agreements and agreed to do an unlawful act, but do not offer any evidence of this agreement, or any evidence that employees were solicited from Crestview Pharmacy rather than choosing to depart voluntarily based on unhappiness with the Noncompete Agreement and threatened

pending termination.  (Tr. 72:7-20; 100:4-9; 104:9-16; 162:23-163:23; 165:9-168:3). Indeed, Plaintiffs do not even allege an unlawful act; they merely repeat naked allegations that employees were solicited and information misappropriated, which is patently false.  (Dkt. 30, pp. 30-31).

Moreover, coordinated action among employees is protected by law.  *See*, Point III(A)(2), *supra*.  Accordingly, Plaintiffs' allegations are insufficient as a matter of law to state a claim for civil conspiracy, as they cannot show any of the first three elements. *See Debos,* 811 F. App'x 547.

Furthermore, at least some of the alleged damages to Crestview's reputation or business are the result of Plaintiffs' decision to fire the only employee with the necessary licenses to continue operation in all of its former markets, Mrs. Densman, while failing to obtain their own licenses or address their understaffing, and Plaintiffs' ill-conceived ultimatum given to employees regarding the non-negotiable Noncompete Agreement.  (Tr. 92:16-93:1; 100:4-9; 104:9-16; 116:8-9; 117:11-118:7; 122:6-21).  Accordingly, Plaintiffs have failed to show a likelihood of success on the merits of the claims at issue in their Motion.

## B. <u>Plaintiffs Cannot Show Irreparable Harm Absent an Injunction</u>

Plaintiffs have not met their burden to show what harm they would suffer absent an injunction.  The only "irreparable harm" Plaintiffs claim they will suffer relates to staffing shortages that have already occurred, that were self-inflicted, and

which only the Plaintiffs are in a position to remedy, and the loss of customers who have every right to select with which pharmacy and pharmacists they prefer to work. (Dkt. 30, pp. 20-21).

Plaintiffs argue that Defendants "admitted" to using trade secret information to compete with Plaintiffs, but there is nothing in the record to support this and tellingly, Plaintiffs do not offer a single citation to the record to support this baseless argument. (Dkt. 30, p. 32). Indeed, the opposite is true. Defendants immediately changed their business name and agreed not to use Plaintiffs' alleged "trade secret" information in direct response to the Plaintiffs' cease and desist notice. Any alleged damage to Plaintiffs' reputation or business cannot be attributed to Defendants.

As to the former Crestview Pharmacy employees working for Defendants, none of them would be eligible for re-hire by Plaintiffs, as they have all refused to sign the Noncompete Agreement. (Tr. 162:23-163:23; 165:9-168:3). There can be no harm to Plaintiffs from their employment with Defendants.

Accordingly, Plaintiffs have failed to meet their burden of showing irreparable harm because the alleged harm has already occurred, and there is no ongoing risk of harm.

### C. The Injury to Plaintiffs Does Not Outweigh Harm to the Defendants

A balancing of the equities falls heavily in favor of the Defendants. The Motion is nothing more than a thinly-veiled attempt by Plaintiffs to stifle

competition, and to intimidate former at-will employees from maintaining gainful employment under the threat of litigation. If the injunction is granted, the Defendants and Nominal Defendants would effectively be barred from employment with Hometown, even though they were employed at will, and were not bound by any restrictive covenants. The Defendants and Nominal Defendants had every right to form a new competitive business. Any risk that Defendants would use the Top Provider List to compete with Plaintiffs, even if it were a valid trade secret, is now moot based on the stipulation to return and destroy the list. (Dkt. 33).

Similarly, any injunction preventing the Defendants from engaging in business with any providers who happen to appear on the Top Provider List would stifle competition and would place restraints on free trade in a market that the Plaintiffs cannot currently compete in. Indeed, Plaintiffs admit that, following or as a result of Mrs. Densman's termination, Crestview Pharmacy surrendered at least thirty licenses to fill prescriptions in states other than Florida, and could not identify what portion of allegedly lost business is attributable to that factor.

In stark contrast, the Plaintiffs will not suffer any legitimate harm in the absence of the injunction. Indeed, any alleged harm to the Plaintiffs arising from the exodus of its employees was self-inflicted from its shortsighted "rollout" of the Noncompete Agreement to its entire workforce under threat of termination, on the heels of well-publicized mass layoffs. Likewise, Plaintiffs made no effort to replace

Mrs. Densman with another licensed person despite her announcement that her last day was March 31, 2023.

There is no ongoing risk to Plaintiffs because any of the alleged breaches of fiduciary duty occurred in the past, and neither the Defendants nor the Nominal Defendants had any duty to the Plaintiffs after April 20, 2023, when their employment ended.

As for the providers that happen to appear on the Top Provider List, they should be free to choose whichever pharmacy they wish to, and since Defendants have destroyed any copies of the list—which was never treated as a proprietary trade secret in the first place—rendering any risk of ongoing injury *de minimis*.

Accordingly, the equities favor the Defendants.

## D. **An Injunction Would Result in a Grave Disservice to the Public Interest**

An injunction would not serve the public interest.  Courts have found, for instance, that voting, fair, timely, accurate elections, or preventing enforcement of unconstitutional ordinances are in the public interest (*Kaimowitz v. Supervisor of Elections*, No. 1:16-cv-257-MW-GRJ, 2016 U.S. Dist. LEXIS 153571, at *16 (N.D. Fla. Oct. 25, 2016); *Michel-Trapaga v. City of Gainesville*, 907 F. Supp. 1508, 1513 (N.D. Fla. 1995)), and that medically unnecessary consultations are not in the public interest. *Hutto v. Delgado*, No. 3:19cv1401/LAC/EMT, 2019 U.S. Dist. LEXIS 205296, at *12 (N.D. Fla. Sep. 10, 2019).

Here, public health and interest would not be served by denying Defendants the ability to freely operate a compounding pharmacy, or by stifling competition. Moreover, an employer should not be able to force out employees who *refuse* to sign restrictive covenants, then immediately enjoin them from working for a competitor, as Plaintiffs are attempting to do here. While Plaintiffs claim that it is in the public interest to protect parties against wrongful acts, Plaintiffs have not adduced any evidence to show that they any of their "suffering" was proximately caused by wrongful acts on the part of the Defendants. (Dkt. 30, p. 35). Accordingly, an injunction would disserve the public interest.

### E. <u>A Bond Is Necessary to Protect Defendants if an Injunction Issues</u>

Pursuant to Fed. R Civ P. 65(c), if the Court does issue a preliminary injunction, it is necessary for Plaintiffs to post a bond "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained," which is within the sound discretion of the trial court. *BellSouth Telecommunications, Inc. v. MCImetro Access Transmission Services, LLC*, 425 F.3d 964, 971; *Bardfield v. Chisholm Properties Circuit Events, LLC*, Docket No. 3:09-cv-232/MCR/EMT, 2010 U.S. Dist. LEXIS 40551, at *7 (N.D. Fla. Mar. 25, 2010).

While Plaintiffs claim that a bond is not necessary because Defendants can suffer no "legitimate" harm, this reasoning is circular. (Dkt 30, p. 36). Defendants

have already changed their business name to disassociate themselves from Plaintiffs, due in part to the reputational harm any association with Plaintiffs could cause. Moreover, Plaintiffs are unlikely to succeed on the merits of their claims. Accordingly, any injunction would cause needless harm to Defendants, their employees, and the local community.

## IV.   **PLAINTIFFS' REMAINING CONTENTIONS LACK MERIT**

The majority of Plaintiffs' Brief contains misstatements of fact that are irrelevant to determining this Motion. Word limits prevent Defendants from responding to each misrepresentation, however, Defendants will briefly respond to the most egregious instances below.

### A. **Defendants Never Competed with Plaintiffs While Employed at Crestview Pharmacy, and Plaintiffs Have Not Shown Otherwise**

As discussed above, the Densmans formed Hometown Pharmacy so that they would have employment once they were laid off, as Plaintiffs had informed them that they would be terminated based on their refusal to sign Plaintiffs' onerous, non-negotiable Noncompetition Agreement.   (Tr. 136:10-13). What Plaintiffs misconstrue as interfering with rollout of the Noncompetition Agreement so Crestview Pharmacy employees could be hired by Defendants (Dkt. 30, p.10-12) was simply lawful coordination with other employees who could not afford their own attorneys, and who ultimately made their own decisions about whether or not

to sign.  (Tr. 163:11-23).  Defendants had no obligation to "remain neutral," and no basis for such an obligation is alleged by Plaintiffs.

While Plaintiffs claim that Ms. Blackmon was solicited away from Plaintiffs (Dkt. 30, p. 12-13), she simply chose to help Mrs. Densman in the organization of the intended business, but was not employed by them while any of them were employed with Crestview Pharmacy.  (Tr. 165:17-24).  Even if Ms. Blackmon's employment status were relevant to the Motion, which it is not, Plaintiffs have not submitted any evidence to contradict Mrs. Densman's testimony regarding Ms. Blackmon's employment and assistance organizing Hometown as permitted by Florida law.

**B. <u>Defendants Did not Cause a Mass Exodus of Employees</u>**

Plaintiffs attempt to blame the Defendants for a mass exodus of employees is downright bizarre, as it has nothing to do with any of the claims at issue before the Court on this Motion, and moreover, it is clear that the employees' resignations were prompted by Plaintiffs' ill-conceived decision to "rollout" a non-negotiable Noncompete Agreement to every employee nationwide at the same time. Nonetheless, Plaintiffs devote no less than four pages of a twenty-page statement of "facts" concocting a conspiracy to convince employees to leave Plaintiffs for Defendants, even though Mr. Charter admitted that he could not identify *any* employee who stated they were leaving for Defendants, and there is no evidence that

any employee left for Hometown before the Densmans were terminated on April 20, 2023.  (Tr. 102:23-103:3).

As to the contention that it was "widely known" Defendants intended to hire staff away from Crestview Pharmacy (Dkt. 30, p. 14-17), there was no such evidence.  Mrs. Densman testified that she did not offer any employee of Crestview Pharmacy employment prior to her termination on April 20, 2023, but acknowledged that she "may" have discussed hiring certain employees once Hometown opened, although she did not have any specific recollection of doing so.  (Tr. 180:3-14; 186:1-8).

As to Plaintiffs' claim that a majority of employees joined Defendants (Dkt. 30, p. 15), only five at-will employees left to work for Hometown, and all of them were subject to termination at any time for declining to sign the Noncompete Agreement.  (Tr. 162:23-163:23; 165:9-168:3).

As for Plaintiffs desperate attempt to attribute the employees' resignation letters to Mrs. Densman, the fact that Ms. Meeks may have shown a copy of the letter to Mrs. Densman before submitting it is not actionable, as Mrs. Densman had no duty to Plaintiffs since she was already terminated by the time Ms. Meeks decided to quit.  Moreover, even if Mrs. Densman reviewed the letter, the law protects collective organizing by employees, including their right to consult with each other, strike, quit or terminate their at will employment if they so choose.  Mrs. Densman's

alleged review of the letter is a protected activity that does not give rise to a breach of duty, much less a conspiracy.    Mrs. Densman flatly denied drafting the resignation letters—and no proof was offered to the contrary—and the fact that the resignation letters were similar is simply not evidence of Defendants' involvement. (Tr. 172:6-8).

The reality is that Plaintiffs ultimatum to its employees, frustration over the Noncompete Agreement and Plaintiffs' management decisions, in addition to staffing issues at the pharmacy—which Mr. Charter admitted were outside Mrs. Densman's control—were the reason the employees resigned from their employment at Crestview. (Tr.109:17-25; 150:8-15).

## C. <u>There Was No Intentional Slowdown of Production</u>

At the outset, the allegation that Defendants intentionally slowed down production while employed with the Plaintiffs is not only false, but it is entirely irrelevant to issues presented on the Motion since this alleged misconduct occurred in the past and there is no ongoing risk of slow production since Defendants' employment was terminated.    Furthermore, what Plaintiffs mischaracterize as an intentional slowdown (Dkt. 30, p. 19) was the result of insufficient staffing at Crestview Pharmacy, which Mr.Charter acknowledged was outside Mrs. Densman's control.  (Tr. 109:17-25).  Mrs. Densman attempted to ease the workload by hiring technicians and worked overtime herself to meet the 48-hour production goal.  (Tr.

150:8-15).  Ms. Densman even gave six weeks' notice, and then agreed to stay on even longer to help the Plaintiffs to ease transition.

As to Mr. Densman "conced[ing]" that he had no incentive to address what Mr. Charter characterized as a mess in the compounding room, the mess was created by Plaintiffs due to short staffing and any lack of incentive was the direct result of Plaintiffs' ultimatum, as Mr. Densman was subject to being fired at any time based on his refusal to sign the Noncompete Agreement.   However, Mr. Densman specifically testified that the cleanliness of the compounding room was important to him, and that the presses were cleaned several times a day.  (Tr. 237:11, 238:8-11).  Regarding the "easily" fixed second tablet press, Plaintiffs could not explain how they could have operated a second press without even the necessary staff to operate one press at full capacity.

In sum, Plaintiffs' transparent attempt to twist the facts is wholly unavailing.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

<u>**WORD LIMIT CERTIFICATION**</u>

Pursuant to Local Rule 7.1(F), undersigned counsel certifies that this brief contains 7,249 words, according to the word-processing system used to prepare this document.

Dated: May 19, 2023.        Respectfully submitted,

BERGER SINGERMAN LLP
*Attorneys for Defendants Crestview City*
*Pharmacy, Inc., Jennifer Reshay Densman,*
*And Christopher Neil Densman*
313 North Monroe Street, Suite 301
Tallahassee, Florida 32301
Telephone: 850-561-3010
Facsimile:  850-561-3013

By: */s/ _Ruth Vafek_____*
      Ruth Vafek
      Florida Bar No. 34220
      rvafek@bergersingerman.com
      zmorton@bergersingerman.com
      drt@bergersingerman.com
      Jordi Guso
      Florida Bar No. 868580
      jguso@bergersingerman.com
      fsellers@bergersingerman.com
      drt@bergersingerman.com

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b)(3) and N.D. Florida Local Rule 5.1, this document is being filed electronically and service shall be through the Court's Transmission Facilities on all persons appearing before this Court.

*/s/ _Ruth Vafek_____*
Ruth Vafek