# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

OPTIO RX, LLC &
CRESTVIEW PHARMACY, LLC,

          Plaintiffs,

    v.

CRESTVIEW CITY PHARMACY,
INC., JENNIFER RESHAY
DENSMAN, CHRISTOPHER NEIL
DENSMAN & BRYAN HENDERSON,

          Defendants,

AMANDA DAVEY, CLAUDIA
BARNETT, KARI WAITES,
VICTORIA BALLARD,
MORGAN MEEKS, KYNDALL
BARBER & ELLEN STAFFORD

          Nominal Defendants.

Case No. 3:23-cv-08993-MCR-HTC

## PLAINTIFFS' POST-HEARING REBUTTAL IN FURTHER SUPPORT OF THEIR EMERGENCY VERIFIED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

In summary, the Densman Defendants planned to open a pharmacy but they could not afford to purchase Crestview Pharmacy (Tr. 244), so they undisputedly opened a pharmacy using Plaintiffs' name, took its confidential top 20 Provider List in the middle of the night at 12:41 am on April 14, 2023 "in accident" (Tr. 145) for no legitimate business purpose and yet admittedly started dispensing to

Plaintiffs top clients DAY ONE - April 24, 2023 (Tr. 147-149, 185, 201-202). How would these clients have known to do business with Defendants DAY ONE?

Ignoring the foregoing facts, Defendants' brief [Dkt. 34] blatantly mischaracterizes the record evidence in a failed attempt to distract from Defendants' documented efforts to wrongfully compete with Plaintiffs during their employment. Such efforts include, but are not limited to, the following material events (which Defendants conveniently ignore):

(1) Defendants formed Crestview City Pharmacy nearly two weeks **prior** to the roll out of the Non-Disclosure Agreement (*Compare* Dkt. 30, p. 6 *with* Tr. 40, 54-55, 127 & Pl. Ex. 7);

(2) The Non-Disclosure Agreement did not contain a non-competition covenant (*Compare* Dkt. 34, p. 4 *with* Pl. Ex. 2);

(3) The record evidence confirms that Defendants began soliciting other Crestview Pharmacy employees to leave their employment and join Defendants at Crestview City Pharmacy in January 2023 and prior to their termination (*Compare* Dkt. 34, p. 31 *with* Tr. 140-41, 207-08 & Pl. Ex. 8);

(4) Mrs. Densman's claim that the Top Providers email was forwarded "accidentally" while searching for emails from Jim Cox is belied by the fact that no other emails were forwarded on April 14, 2023, and she never voluntarily notified Plaintiffs of the so-called mistake (Compare Dkt. 34, p. 9 *with* Pl. Exs. 9(a) & 14; Tr. 145-46);

(5) Defendants operated under the Crestview City Pharmacy tradename beginning April 24, 2023, and only ceased operating under that name after being sued. (*Compare* Dkt. 34, pp. 8, 29 *with* Tr. 214-15 & Dkt. 33); and

(6) Mrs. Densman testified that she started dispensing as Crestview City Pharmacy on April 24, 2023 and all of a sudden, multiple clients of the

> Plaintiffs' pharmacy stopped doing business with Plaintiffs and began doing business with Defendants. (Tr. 185, 201-202).

Defendants' misleading allegations and arguments with respect to the foregoing (and other) points underscores that Defendants knowingly engaged in wrongful conduct warranting entry of a preliminary injunction to stop the harm during the pendency of this action.

Defendants' brief further ignores that Plaintiffs are "not required to prove [their] case in full at a preliminary injunction stage." *International Markets Live v. Huss*, 2020 U.S. Dist. LEXIS 224010, at *32 (S.D. Fla. Nov. 25, 2020). Rather, Plaintiffs need only demonstrate substantial likelihood of success on the merits, which "requires a showing of only likely or probable, rather than certain, success." *Navarro v. Florida Institute of Technology, Inc.*, 2023 U.S. Dist. LEXIS 27519, at *9 (M.D. Fla. Feb. 17, 2023).

The Verified Complaint, Verified Motion, and Post-Hearing Brief, as supported by testimony and documents introduced at the Hearing, demonstrate that Plaintiffs have established a likelihood of success as to each of their claims, including the trade secret misappropriation, breach of the duty of loyalty and civil conspiracy claims upon which Plaintiffs currently seek injunctive relief. *See International Markets Live*, 2020 U.S. Dist. LEXIS 224010, at *32 (noting that "all of the well-pleaded allegations [in a movant's] complaint … in support of the motion for a preliminary injunction are taken as true."). They further demonstrate

3

that Plaintiffs have satisfied the remaining elements necessary to obtain injunctive relief, as explained below:

## I.   PLAINTIFFS HAVE ESTABLISHED A LIKELIHOOD OF SUCCESS ON THEIR CLAIMS

### A.   Defendants Misappropriated Plaintiffs' Trade Secrets

#### 1.   The Records in Question Constitute Trade Secrets

Defendants incorrectly assert that the records which Mrs. Densman forwarded to her personal email on the eve of her planned resignation do not constitute a trade secret because Mrs. Densman may have known some of the names on the list as a result of her work at Crestview Pharmacy. The subject documents are trade secrets regardless of Mrs. Densman's alleged knowledge while she was employed as a manager of Plaintiffs. *See Hurry Family Revocable Trust v. Frankel*, 2022 U.S. Dist. LEXIS 140760, at *27 (M.D. Fla. Aug. 8, 2022) ("Plaintiffs provided more than enough evidence … that both their Top 50 Customer List and their pricing structure constitute trade secrets" and rejecting defendant's argument that "he knew of at least half of the accounts before he started at [the company]").

Defendants further ignore that the misappropriated documents in question consist of more than a random list of medical providers.  The list is a confidential compilation of Plaintiffs' Top 20 Providers not shared with the general public or even with all of Plaintiff's personnel. Moreover, these records include confidential

financial information about those top clients, such as the volume, cost and the retail revenue generated from prescriptions filled for them. (Tr. 57-58; Pl. Ex. 9(a).) The records in question further include Plaintiffs' financial reports from January 2022 through December of 2022, which included sensitive financial information concerning Crestview Pharmacy's profitability, pricing, margins, and vendor information. (Pl. Exs. 9(b)-(c) & 14; Tr. 59-62, 192).

In other words, the documents secretly forwarded by Mrs. Densman consisted not only of Plaintiffs' Top 20 Providers, but also sensitive financial data concerning the services performed by Plaintiffs, profitability of those services, and revenue generated therefrom—precisely the type of information that Defendants could use to unfairly compete against Plaintiffs with respect to Plaintiffs' Top Providers on behalf of "Crestview City Pharmacy".  All of this information was forward by Mrs. Densman to herself months after she announced her resignation on February 14, 2023. (Pl. Ex. 6).

Moreover, the Verified Complaint allegations, together with the Hearing testimony, establish the value of this information to Plaintiffs and great efforts that Plaintiffs have undertaken to generate and protect this information from disclosure. (Compl. ¶ 21-29; Tr. 58-62.) Obviously, Mrs. Densman was fully aware of the importance, and confidential nature, of the documents she took without permission.

Why did she take them if they were fully independently known to her or of no value?  Why did she not return the pilfered trade secrets before being sued?

Client lists and related financial information such as these routinely are deemed to be trade secrets. *See*, e.g., *AutoNation, Inc. v. Mulleavey*, 2019 U.S. Dist. LEXIS 170466 (S.D. Fla. Aug. 22, 2019) (stating that customer lists, especially those with specific details, are considered trade secrets) (listing cases); *Southeastern Mechanical Services v. Brody*, 2008 U.S. Dist. LEXIS 112332, at *2-3 (M.D. Fla. Oct. 15, 2008) (finding that sensitive financial documents are trade secrets).

### 2. Plaintiffs Sought to Protect Their Trade Secrets from Disclosure

Defendants blatantly mischaracterize the record by asserting that Plaintiffs failed to take adequate precautions to protect their trade secrets from disclosure. Contrary to Defendants' assertions, Plaintiffs took numerous steps to protect their trade secrets from disclosure, including: (1) restricting access to trade secrets through password protection on Plaintiffs' computer systems (Tr. 62); (2) maintaining an Employee Handbook containing a Confidentiality of Business Information policy that precluded the disclosure of "trade secrets, … client data and information" (Tr. 63-64; Pl. Ex. 10); and (3) rolling out a Non-Disclosure Agreement to all employees Company-wide in October 2022 (Tr. 40-41; Pl. Ex. 2). Defendants self-servingly ignore these safeguards and assert that Plaintiffs true

6

failure was trusting Defendants not to steal from their employer – which this Court should reject as preposterous.

Plaintiffs' efforts to protect their trade secrets are more than adequate to support their trade secret misappropriation claims. *See All Star Recruiting Locums, LLC v. Ivy Staffing Solutions, LLC*, 2022 U.S. Dist. LEXIS 66558, at *30-32 (S.D. Fla. Apr. 8, 2022) (finding that reasonable protective measures were taken where database information that "was password protected and access on the provider side was limited"). Moreover, it should not matter that, in furtherance of their efforts to compete, Defendants refused to execute the Non-Disclosure Agreement or acknowledge receipt of the Employee Handbook. Mrs. Densman testified as to her awareness of the Handbook and her willful disregard of her obligations therein to protect Plaintiffs' trade secrets from disclosure, neither of which constitutes a defense to knowingly misappropriating Plaintiffs' trade secrets. (Tr. 93, 154-55.)

### 3.  Defendants Misappropriated Plaintiffs' Trade Secrets

Defendants' misappropriation of Plaintiffs' trade secrets is well established in the record. Defendants were well aware that they should not have forwarded Plaintiffs' financial statements or Top Providers' email. Indeed, Mrs. Densman's testimony that she allegedly "deleted" (while somehow still being able to recover) the Top Providers email after forwarding it to her personal email underscores that she knew that the document was improperly obtained, and her excuses on the

record do not pass the proverbial "red face test." (Tr. 146-47.) Moreover, the fact that Mrs. Densman forwarded these documents only months after announcing her intention to resign, including her forwarding of the Top Provider email just one week prior to her planned resignation, and the fact that she is actively doing business with Plaintiffs' clients from DAY ONE, further supports misappropriation. *All Star Recruiting Locums*, 2022 U.S. Dist. LEXIS 66558, at *37 (The timing of these emails—sent just before Mr. Hurley and Solano's *voluntary* resignations—provides further evidence of misappropriation."). There is no question that discovery in this matter will lead to greater evidence of same. Accordingly, the record before the Court establishes that Plaintiffs met their burden of showing "likely or probable" success on their trade secret misappropriation claims.

### B.    Defendants Breached Their Duty of Loyalty

Defendants cannot seriously maintain that they did not owe a duty of loyalty which they breached by their numerous wrongful acts.  Even the cases relied upon by Defendants recognize the duty and characterize the types of acts committed by Defendants to be wrongfully disloyal conduct, providing further legal support for the notion that Plaintiffs have established a likelihood of success on their breach of the duty of loyalty claim. Indeed, *Furmanite America, Inc. v. T.D. Williamson, Inc.*, on which Defendants primarily rely, explains that "*an employee may not*

8

*engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment*." 506 F. Supp. 2d 1134, 1149 (M.D. Fla. 2007) (emphasis added).

Ironically, while citing cases declaring the foregoing governing standard, Defendants' brief conveniently ignores it, not applying it to Defendants' blatant and repeated acts of disloyalty to Plaintiffs prior to their employment termination, which Defendants instead ignore as well. Such documented, unlawful activity includes, but is not limited to: (1) Defendants' efforts to coerce other employees to refrain from signing the Non-Disclosure Agreement; (2) Defendants' solicitation of Emily Blackmon to serve as the general manager of Crestview City Pharmacy in or around January 2023; (3) Defendants' successful monthslong effort to solicit Crestview Pharmacy employees to join Defendants at Crestview City Pharmacy after they resign *en masse*; (4) Defendants' forwarding of numerous confidential and proprietary business records to their personal email under the cover of night; and (5) Defendants' efforts to sabotage Crestview Pharmacy's operations prior to their departure [Dkt. 30, Sec. II(C)(1)-(5)]. That this unlawful conduct already is well documented in the record at this early juncture—prior to the taking of any discovery—only underscores that Plaintiffs have met their burden of demonstrating a likelihood of success on the merits on their breach of the duty of loyalty claim.

9

Defendants' efforts to classify their misconduct as simply "preparing to open a competing business" are unconvincing and without support in the record. Defendants took active steps to compete with Plaintiffs' business—**while still employed at that business**. Moreover, contrary to Defendants' assertions, Defendants' illegal and tortious conduct is not somehow mitigated by the fact that the Nominal Defendants resigned *en masse* <u>after</u> Defendants' employment had been terminated, or that Defendants claim to have since returned Plaintiffs' misappropriated confidential trade secrets. *See Mortgage Now, Inc. v. Stone*, 2010 U.S. Dist. LEXIS 152776, at *27-28 (N.D. Fla. Sep. 29, 2010) ("Heppding's assertion that no damages occurred since none of the employees he allegedly solicited left Mortgage Now because they were terminated before doing so, ***does not vitiate the claim against him for breach of the duty of loyalty***.") (emphasis added); *Lighthouse List Co., Ltd. liability Co. v. Cross Hatch Ventures Corp.*, 2013 U.S. Dist. LEXIS 201882, at *22-23 (S.D. Fla. Aug. 9, 2013) (downloading and copying of "valuable information that [defendant] desired to take with her for her new place of employment … while still at [the plaintiff company] exceed mere preparation"). Defendants admitted that they solicited their fellow employees while still employed by Crestview Pharmacy. Defendants further admitted to forwarding Plaintiffs' confidential trade secret information, in each case demonstrating by

their own admissions that Plaintiffs are likely to succeed on their breach of duty of loyalty claims.

Moreover, Defendants cannot excuse their misconduct by asserting a fictional "right to organize." It is a fundamental principal of the National Labor Relations Act that the right to organize "does not extend to those employees deemed to be supervisors." *Cooper/T. Smith, Inc. v. NLRB*, 177 F.3d 1259, 1263 (11th Cir. 1999). This is because "supervisors [are] management obliged to be loyal to their employer's interests." *Beasley v. Food Fair of North Carolina, Inc.*, 416 U.S. 653, 659-60 (1974) (explaining that "supervisors" were excluded from collective bargaining because they were considered part of "management obliged to be loyal to their employer's interests"). Accordingly, because the Densmans-particularly Mrs. Densman-were responsible for supervising other employees at Crestview Pharmacy, they owed a duty of loyalty to Plaintiffs to refrain from engaging in the very disloyal conduct at issue. (Tr. 38-39, 129, 134-35, 238.)

### C.    Defendants' Conduct Constitutes a Civil Conspiracy

As Defendants correctly note, "Florida law does not recognize an independent cause of action for civil conspiracy; rather, a valid claim must allege an underlying illegal act or tort on which the conspiracy is based." *Traffic Tech, Inc. v. Montoya*, No. 16-cv-60177-BLOOM/Valle, 2016 U.S. Dist. LEXIS 189358, at *20 (S.D. Fla. Feb. 29, 2016). But that statement of the law offers no support for

Defendants' position. Defendants ignore that because Plaintiffs have established a likelihood of success on their trade secret misappropriation and breach of the duty of loyalty claims, Plaintiffs also have a likelihood of success on their civil conspiracy claim given Defendants' coordinated, wrongful efforts to Plaintiffs' detriment.

Indeed, the record evidence established that during their employment with Plaintiffs, the Densmans, with support from Bryan Henderson, engaged in a monthslong coordinated effort to unfairly compete with Plaintiffs. Indeed, the Densmans acted in concert to leave Plaintiffs' pharmacy in disarray. Mr. Densman himself acknowledged he had no incentive to clean the compounding room or remedy any issues that may cause delay (Tr. 237-238).  April Koski testified that Mr. Densman told her that they were opening a new pharmacy about  five minutes away called Crestview City Pharmacy, that they were all going over there, and that Bryan Henderson was going to stay behind and transfer all of the prescriptions over to the new pharmacy.  (Tr. 208-211.)  Defendants attempt to baldly disparage Ms. Koski by characterizing her as being on Plaintiffs' payroll does nothing to effectively challenge her credible, unrefuted testimony. In fact, Mr. and Mrs. Densman urged the employees not to sign the Non-Disclosure Agreement, making it apparent to the employees that they were all going to move, and, in fact, they did move to the new pharmacy. (*Id.*)

Such coordinated efforts, and the harm resulting therefrom, are set out in detail in the Verified Complaint (Dkt. 1, ¶¶ 52-73), Verified Motion (Dkt. 1-6, p. 9-16, 20-26), Post-Hearing Brief (Dkt. 30, pp. 30-31), the evidence obtained at the Hearing, as well as above in Section I(B). Accordingly, Plaintiffs have demonstrated a likelihood of success as to their civil conspiracy claim. *See generally Traffic Tech, Inc.*, 2016 U.S. Dist. LEXIS 189358, at *20 (finding that plaintiff established a likelihood of success as to civil conspiracy based on allegations that the defendants "conspired to and did so create and use" a sole proprietorship "to illegally submit fraudulent invoices").

## II. <u>PLAINTIFFS HAVE DEMONSTRATED THE THREAT OF FURTHER IRREPARABLE HARM</u>

Defendants advance a preposterous and unsupported argument that they should be permitted to escape the Court's equitable authority because they quickly proceeded with their unlawful acts despite their receipt of cease and desist letters (Pl. Exs. 11(a) & (b)) and Plaintiffs' prompt filing of this lawsuit [Dkt. 1]. The Court should reject this argument as it effectively would reward Defendants for their knowing and well-documented misconduct.

In any event, contrary to Defendants' assertions, Plaintiffs have established the threat and likelihood of further irreparable harm absent injunctive relief. Indeed, as noted in the Verified Motion and Post-Hearing Brief, "[i]n Florida, irreparable injury is presumed when there has been trade secret misappropriation."

*Seacoast Banking Corp. v. Diemer*, 2020 U.S. Dist. LEXIS 107005, at *6-7 (M.D. Fla. Feb. 3, 2020). Defendants do not dispute this presumption in their brief. (Dkt. 34, pp. 24-25.)

Plaintiffs further have demonstrated a very real, substantial present risk of irreparable harm absent an injunction. Defendants have admitted to being in possession of Plaintiffs' trade secret information, concerning Plaintiffs' business and their Top Providers. (Tr. 145.) There is no dispute that this information remained in Defendants' possession at the time they began operating Crestview City Pharmacy—thereby creating an unfair market advantage that continues to threaten Plaintiffs' customer relationships, goodwill and competitiveness in the market *vis-à-vis* Crestview City Pharmacy. [Dkt. 33]; *Freedom Medical, Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1278 (M.D. Fla. 2020) ("[Plaintiff] risks losing customers, goodwill, and market competitiveness to its direct competitor … in the highly competitive healthcare field."); *Seacoast Banking Corp.*, 2020 U.S. Dist. LEXIS 107005, at *7 (finding irreparable harm where "[the plaintiff] has shown that confidential customer banking information remained in the hands of its former employees as they went to work for a competitor"). Thus, following Defendants' misappropriation of Plaintiffs trade secrets, the threat of further irreparable harm to Plaintiffs' business, in addition to the irreparable harm already caused by Defendants' tortious conduct, remains both clear and present.

## III.   THE THREAT OF HARM TO PLAINTIFFS FAR OUTWEIGHS ANY POTENTIAL HARM TO DEFENDANTS

In a desperate attempt to avoid an injunction, Defendants once again misconstrue the record evidence, this time with respect to the balancing of harms. Contrary to Defendants' assertions, Plaintiffs do not seek to "stifle competition" or prevent the Nominal Defendants from securing gainful employment, as Defendants inaccurately claim. Rather, Plaintiffs simply seek to compel Defendants' compliance with their legal obligations as to Plaintiffs and preserve the status quo by preventing further irreparable harm (as detailed in the Verified Motion, Post-Hearing Brief and above in Section II) caused by Defendants' continued unfair competition. In particular, as noted in the Post-Hearing Brief [Dkt. 30, p. 3], Plaintiffs do not seek an order precluding Defendants from operating their competing business. Rather, Plaintiffs seek an Order enjoining Defendants from continued unfair competition with respect to: (1) Defendants' solicitation of Plaintiffs' Top Providers confidential information which Defendants unlawfully misappropriated in anticipation of their planned resignation and competition, and (2) Defendants' active employment of the Nominal Defendants whom Defendants improperly solicited to leave their employment with Plaintiffs.[1] "Such relief cannot be said to harm Defendants as it would simply restore the status quo." *ACR*

---

[1] While Defendants quibble over what was said to Plaintiffs' employees during their and Defendants' employment with Plaintiffs, they cannot deny that communications took place. After the fact, litigation fashioned reference to laws pertaining to collective bargaining is wholly unavailing.

*Electronics, Inc. v. DME Corp.*, 2012 U.S. Dist. LEXIS 201353, at *41 (S.D. Fla. Oct. 31, 2012).

In such cases where a plaintiff faces the "loss of its [c]onfidential [i]nformation, customers and market share to its competitor," courts have found that the "threatened injury outweighs any harm to" defendants." *See Freedom Medical, Inc.*, 469 F. Supp. 3d at 1279. Even where the defendants offer to return misappropriated records, injunctive relief is still appropriate because the risk of irreparable harm remains. *See Hayes Healthcare Services, Ltd. liability Co. v. Meacham*, 2019 U.S. Dist. LEXIS 113890, at *15 (S.D. Fla. Feb. 1, 2019) (An "offer to return the [trade secret] information does not obviate the need for a preliminary injunction").

Moreover, the denial of a preliminary injunction would result in further irreparable harm to Plaintiffs through continued loss of "customers, business opportunities and trade secrets, which cannot be compensated adequately by an award of damages." *ACR Electronics, Inc.*, 2012 U.S. Dist. LEXIS 201353, at *42. The foregoing rationale likewise extends to the Nominal Defendants whom Defendants now seek to engage based on their improper solicitations while employed by Plaintiffs. *See Insurance Field Services, Inc. v. White & White Inspection and Audit Serv., Inc.*, 384 So.2d 303 (1980) (finding that the defendant breached his duty of loyalty and thus the "corporate appellant can assert no claim

16

which would entitle it to the benefits which flowed from the [defendants]' breach of duty").

On the other hand, and contrary to Defendants' unsupported position otherwise, the potential harm to Defendants posed by the limited injunction that Plaintiffs seek is negligible as Defendants would still be permitted to operate their competing business (albeit without the benefit of Plaintiffs' misappropriated trade secret information and improperly solicited employees). Thus, the balance of the harms weighs heavily in Plaintiffs' favor.

## IV.   PLAINTIFFS HAVE DEMONSTRATED THAT AN INJUNCTION FURTHERS THE PUBLIC INTEREST

Defendants curiously cite to inapposite cases to support their supposition that an injunction would not further the public interest. In fact, Florida courts have acknowledged that the public interest is served by granting injunctive relief in cases where the defendants have misappropriated trade secrets in order to unfairly compete, as alleged here in Plaintiffs' Verified Motion and Post-Hearing Brief [Dkts. 1-6 & 30]. The courts reached this conclusion because "the Florida Legislature has determined that injunctions to protect trade secrets … serve the public interest." *Autonation, Inc. v. Mulleavey*, 2019 U.S. Dist. LEXIS 170466, at *15 (S.D. Fla. Aug. 22, 2019) (citing Fla. Stat. Ann. § 688.003). Accordingly, in this case, entry of a preliminary injunction would further the public interest.

17

## V.     BOND IS NEITHER NECESSARY NOR APPROPRIATE

Defendants fail to articulate any legitimate basis for requiring a bond. This is not a case in which Plaintiffs seek to put Defendants out of business. Rather, Plaintiffs merely seek to prevent further *unfair* competition by Defendants *See supra* Sec. III. Defendants otherwise are free to continue operating their pharmacy, subject to the stipulations to which Defendants have agreed [Dkt. 33]. Accordingly, the Court should exercise its discretion by declining to require the posting of a bond. *See International Markets Live*, 2020 U.S. Dist. LEXIS 224010, at *33-34 (declining to order a bond where "[the plaintiff] has shown a substantial likelihood of success on the merits and the imposition of a preliminary injunction will not preclude [the defendant] from continuing to earn a living").

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs' respectfully request that the Court grant Plaintiffs' motion for preliminary injunction and such other relief as the Court deems just and proper.

Dated: May 23, 2023                    Respectfully submitted,

                                   **OPTIO RX, LLC & CRESTVIEW PHARMACY, LLC**


                                   By: /s/ *Alexis M. Dominguez*

                                   Aliette D. Rodz
                                   ARodz@shutts.com
                                   SHUTTS & BOWEN LLP
                                   200 S. Biscayne Boulevard
                                   Suite 4100
                                   Miami, Florida 33131
                                   Telephone: (305) 347-7342
                                   Facsimile: (305) 381-9982
                                   -And-

                                   Alexis M. Dominguez
                                   adominguez@nge.com
                                   (*admitted pro hac vice*)
                                   NEAL, GERBER & EISENBERG LLP
                                   Two North LaSalle Street
                                   Suite 1700
                                   Chicago, IL 60602-3801
                                   Telephone: (312) 269-8000
                                   Facsimile: (312) 269-1747

                                   *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on May 23, 2023, he caused the foregoing document to be electronically filed with the Clerk of Court using CM/ECF, which sent notification of such filing to all counsel of record.

/s/ *Aliette D. Rodz*

## <u>CERTIFICATION OF WORD COUNT</u>

The undersigned counsel hereby certifies that the relevant portions of the foregoing document contains 3,862 words.  Plaintiffs filed Agreed Motion to Exceed Word Limits by no more than 700 additional words prior to the filing of this Rebuttal Brief.  [D.E. 36]

/s/ *Aliette D. Rodz*